**MELINDA FERRARA, Respondent-Appellant, v STANLEY BERN-STEIN et al., Appellants-Respondents, et al., Defendants.**

First Department, April 2, 1992

APPEARANCES OF COUNSEL

*Carol M. Roberts* of counsel *(Joseph S. Rosenthal* with her on the brief; *Bondy & Schloss,* attorneys), for appellants-respondents.

*Mark Bower* of counsel *(Leonard L. Finz, P. C.,* attorney), for respondent-appellant.

**OPINION OF THE COURT**

ASCH, J.

Plaintiff commenced this medical malpractice action to

recover for, *inter alia,* the emotional trauma and distress suffered when she experienced a spontaneous miscarriage after an unsuccessful abortion procedure.

Upon arriving at 1995 Broadway, the address of Lincoln Medical Practice, plaintiff Ferrara spoke to a receptionist behind a countertop desk. She "advised them that I had an appointment and what it was for, and they handed me papers and told me to go to a waiting area and sit down". After she had completed the forms, plaintiff and her boyfriend, who had accompanied her, spoke to a nurse who came in and to whom they gave the forms. Plaintiff was told how much the procedure would cost, that she had to pay for it at that time and that she had a choice of either general or local anesthesia. In her testimony, plaintiff noted the people she spoke to did not identify themselves as working for anyone in particular. She did not recall seeing any signs in the room or any directories of personnel. She did remember, however, being told that she had to pay the fee in cash and did so. She also testified that no doctors' names were mentioned to her at all. Another nurse performed the urine test and a blood test on plaintiff. She was then directed into another room where she changed into a paper gown and was brought into an operating room. After plaintiff lay down on the table, a nurse came in and took her blood pressure "or something" and advised her that the doctor would be right with her. When the doctor came in he introduced himself and told her he was Dr. Wyman Garrett. Dr. Garrett told plaintiff he was going to perform the abortion and explained the procedure. After the procedure, Dr. Garrett said "nothing" to plaintiff. He did come into the recovery room, took her blood pressure and asked how she felt. He did not tell her anything at the time about returning to the clinic, nor did he discuss anything about any follow-up visits with her. However, he told her that she might experience some cramps and that if they became severe or painful not to take aspirin but Tylenol. Just before plaintiff left, a nurse gave her a "Rogam" shot telling her they were giving it to her because she was RH negative. The charge for the shot was extra, $20 or $25. After plaintiff paid and was getting ready to leave, the nurse in the reception area told her to call and make an appointment for two weeks later for a follow-up visit but did not offer to make the appointment at that time. She was given a receipt for the shot on which the name "Lincoln Towers Medical Doctors' Offices" appeared. On Monday or Tuesday, after the abortion, plaintiff called and made an appointment

for a follow-up visit two Saturdays from the date on which she had the procedure done (i.e., for January 23). However, the second week after the abortion she experienced cramps and took Tylenol. On January 16, 1982 the Lincoln facility received a pathology report which suggested the possibility she was still pregnant. While a notation on the pathology report indicated the plaintiff had been called about the results and told to return to the center for a follow-up, plaintiff testified she never received any such call. In fact, she rescheduled her January 23, 1982 appointment for the following Saturday because a snowstorm had been predicted for the 23rd.

At the beginning of the third week after the abortion, plaintiff experienced additional cramps which became steadily worse until she had to leave work. She called the Lincoln facility on January 28, 1982 and was instructed to return that day. She requested an appointment for the following day but when the cramps grew even worse plaintiff asked her boyfriend to take her to the hospital in New Jersey. While in the hospital she experienced even more severe cramps and because she felt "pressure" went into the ladies' room. While on the toilet, plaintiff suffered a spontaneous miscarriage and delivered a 4½-inch fetus into the toilet. She testified she had looked down and saw her fetus, a baby boy hanging from her and became hysterical and started to scream. She was rushed with the fetus, still attached to the umbilical cord, to an examination table where a doctor delivered the placenta. Plaintiff remained in the hospital for about 2 or 3 days.

Plaintiff alleged she suffered posttraumatic depression, nightmares and sleeplessness. She also became withdrawn and was reluctant to resume normal intimate relations with men for a substantial period of time. Further, she visited a psychiatrist, one Dr. Gregorius, who testified as to his diagnosis that plaintiff still suffered from the emotional trauma.

Plaintiff sued Drs. Wyman Garrett and Stanley Bernstein who operates Lincoln's Women's Services as Stanley Bernstein doing business as Lincoln Women's Services, individually. She also sued Bernstein doing business as Lincoln Women's Services, and Lincoln Women's Services. In addition, plaintiff joined Dr. Alan Morris who was charged with coordinating the operating schedules and overseeing the procedures performed at the facility as well as Lincoln Towers Medical Center and Bradford Medical Building Associates alleging that Lincoln Towers Medical Center and Bradford Medical Building Associates were entities related to Lincoln's Women's Services oper-

ated by Bernstein at the same location, the third floor of 1995 Broadway in Manhattan. Dr. Garrett defaulted at the commencement of the case and while Lincoln Towers Medical Center and Bradford Medical Building Associates, Inc., answered the complaint, their attorneys later withdrew and neither appeared at the trial.

Testimony elicited by plaintiff was that Dr. Stanley Bernstein, a urologist, took over the lease to almost 7,000 square feet of medical and office space located on the third floor at 1995 Broadway. He leased from its owner all of the medical equipment on the premises for $23,000 per month. He paid an additional $2,000 per month for 1,000 square feet of office space on the floor for his own personal use and then entered into an agreement with the landlord which gave him the exclusive right to provide any physician practicing on the premises of the third floor with "clerical and administrative" support services. Dr. Bernstein also filed certificates to do business under the names Lincoln Women's Services and Lincoln Medical Practice. He advertised for abortions under these names. He also entered into an agreement with Dr. Alan Morris pursuant to which Dr. Morris was responsible for coordinating the abortion schedules. Doctors doing abortions could only use the procedure rooms with Dr. Bernstein's approval and he and he alone reviewed the credentials of gynecologists or other physicians seeking to practice on the third floor. In addition to placing advertising for abortion services on the premises under the name Lincoln Medical Practice and Lincoln Women's Services, Dr. Bernstein provided the abortion service operation through an entity he owned known as Lincoln Service Group, with administrative help. He hired receptionists, secretaries, and other medical support personnel and provided the operation with telephone facilities and other services as well. The entire third floor had only one switchboard managed by Dr. Bernstein's employees and there was only one telephone number for all the offices on the floor. This was the telephone number used in the advertisements by Lincoln's Women's Services seeking abortion patients. Moneys were collected from abortion service patients by the employees of Dr. Bernstein and a portion of those moneys was allocated by Dr. Bernstein to the various persons performing abortions such as Dr. Morris and Dr. Garrett. Dr. Bernstein, in paying these doctors, would deduct from the fees charged patients, moneys to repay him for the individual doctor's use of the medical office space, secretarial services,

and anesthesiological services, and supplies and for advertising, leaving the individual abortion doctor with approximately $25 for each abortion performed by him. Usually, Dr. Garrett got paid in cash for only those abortions performed by him and billed Dr. Morris for his services. However, at times, Dr. Bernstein would give Dr. Garrett an envelope containing cash in payment for such services. There was a sign on the premises which read Lincoln Medical Practice. However, as each physician was granted permission to practice on the third floor, Dr. Bernstein would contact the landlord and request that that doctor's name be listed on the building's directory under the heading Lincoln Medical offices. There were more than 150 abortions per week performed at this facility.

After a jury verdict of $315,000 was returned in favor of the plaintiff, the IAS court granted a new trial on all issues unless the plaintiff agreed to accept the reduced amount of $125,000, the sum of $20,000 representing pain and suffering and $105,000 for plaintiff's emotional distress.

▮ Defendants contend that the award for physical pain and suffering must be dismissed because these injuries are a natural accompaniment of the childbirth process, citing *Prado v Catholic Med. Center* (145 AD2d 614). *Prado* sought damages because of a delay in performing a Caesarean section which resulted in a stillbirth. *Prado,* and the cases which hold likewise, deny recovery for pain *naturally* associated with the childbirth process *(supra,* at 615). Unlike the plaintiffs in those cases, the plaintiff herein did not receive treatment, however negligent, for pregnancy and childbirth. She was treated for a medical termination of pregnancy. Accordingly, the physical pains she suffered from the abortion or miscarriage, while they might be naturally associated with the childbirth process, most emphatically were not naturally associated with the abortion procedure for which she had contracted, and the lack of success of which, the jury determined, she had not been properly informed. To express it differently, the plaintiff's injuries were not a natural accompaniment of her underlying condition or illness for which she was treated.

▮ Defendants further assert that plaintiff's claims for emotional distress must also be dismissed since plaintiff admits that this distress resulted from viewing the stillbirth of her fetus. Defendants contend that absent independent physical injury to the mother, she may not recover for emotional distress which arose from witnessing the birth of a deformed or stillborn baby, citing, *inter alia, Tebbutt v Virostek* (65

NY2d 931). Once again, the defendants misinterpret the nature of plaintiff's injuries and claims. Plaintiff, herein, alleged and proved physical injury distinct from any injury suffered by the fetus, unlike the facts in *Tebbutt* where the death of the fetus occurred one month before the stillbirth as a result of a negligently performed amniocentesis, and the court found the plaintiff alleged no physical injury distinct from that suffered by the fetus. *Vaccaro v Squibb Corp.* (52 NY2d 809), where a mother sought recovery for emotional injuries caused by harm done to the fetus of which she was unaware until the later birth, is also inapposite, since, there also, the mother did not allege independent injuries to herself, as plaintiff does herein. "Plaintiff does not seek to recover for consequential emotional harm caused by observing or learning of injury or death to a third person as did the plaintiffs in *Tebbutt v Virostek* (65 NY2d 931), *Kennedy v McKesson Co.* (58 NY2d 500), *Becker v Schwartz* (46 NY2d 401), *Vaccaro v Squibb Corp.* (52 NY2d 809); *Howard v Lecher* (42 NY2d 109) and *Tobin v Grossman* (24 NY2d 609). On the contrary, her mental anguish and depression are the direct result of defendants' breach of a duty owed directly to her in giving her erroneous advice on which she affirmatively acted in deciding to have the abortion. The emotional distress for which she seeks recovery does not derive from what happened to the fetus; it derives from the psychological injury directly caused by her agreeing to an act which, as the jury found, was contrary to her firmly held beliefs. Defendants' breach of duty was the precipitating and proximate cause of that injury." *(Martinez v Long Is. Jewish Hillside Med. Center, 70 NY2d 697, 699.)*

Likewise in this case, plaintiff's emotional distress does not derive so much as from what happened to the fetus, but rather from what happened to *her* in undergoing a spontaneous miscarriage. Further, as the jury found, her injuries were the direct result of the defendants' negligence in failing to advise her that she could still be pregnant, thereby enabling her to obtain a timely second abortion. Accordingly, this is a malpractice action based on the failure to properly advise plaintiff of her condition which caused both her physical and emotional injuries. "That these decisions and actions involved an abortion does not, as defendants suggest, require us to regard the case as something it is not—i.e., an effort by plaintiff to assert a claim for damages on behalf of her unborn child for injuries done to it * * * or a claim for damages based on plaintiff's emotional and psychological stress in witnessing

and knowing of the injury to the fetus and its loss *(see, Tebbutt v Virostek, supra)." (Lynch v Bay Ridge Obstetrical & Gynecological Assocs.,* 72 NY2d 632, 636.)

■ The defendants further contend that the malpractice found by the jury was not the proximate cause of the injuries suffered by plaintiff, citing *Koehler v Schwartz* (48 NY2d 807). However, in that case, the plaintiff who was being treated for cancer, became pregnant and was advised to undergo an abortion, which she did. The procedure was unsuccessful and she gave birth to a healthy child. She brought a malpractice action alleging that she suffered emotional and psychic injuries from giving birth. The Court of Appeals found that there was no proof that the delay in notifying her of the failure of the abortion was an independent cause of her injuries, since the plaintiff had testified that she could not have undergone a second abortion. Here, on the other hand, there was proof submitted to the jury that had the fact that the abortion had been unsuccessful been communicated to the plaintiff, she would have sought appropriate medical treatment, i.e., a second abortion. Plaintiff had testified that she had discussed her pregnancy with her boyfriend and decided that she would be unable to rear a child.

Further, while the concept of proximate cause is circumscribed by policy considerations which limit the search for legal causes to place manageable limits upon the liability that flows from negligent conduct, there was enough evidence before the jury to establish a prima facie case generally showing that the negligence of Bernstein employees, in not advising plaintiff of the lab report indicating the abortion was unsuccessful, was a substantial cause of the events which produced the injury *(Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 314-315).

■ Defendant asserts that the jury's finding that plaintiff was negligent in not returning on her own for a follow-up examination, but that this negligence was not a proximate cause of her injuries, was "inconsistent". However, as alluded to by the *Derdiarian* court, there are degrees of negligence and degrees of proximate cause, circumscribed by policy considerations. The jury could well find the plaintiff negligent for not keeping a doctor's appointment, or for not calling and making such an appointment when she felt a twinge or cramp. Compared to the negligence of the doctor or his staff which did not call to inform her the procedure was unsuccessful and to come back in, however, this negligence of the

plaintiff was *not* the proximate cause of the injuries. The verdict, therefore, contrary to the assertion of defendant, was sensible, practical and consistent with the evidence.

We have examined the remaining contentions of defendants and plaintiffs and find them to be without merit.

Accordingly, the orders of the Supreme Court, New York County (Helen Freedman, J.), entered March 5, 1990, and June 7, 1990, which, *inter alia,* denied defendants-appellants' motion to dismiss the plaintiff's complaint, but granted the motion to set aside the verdict unless the parties stipulated to the sum of $125,000 as damages, should be affirmed, without costs or disbursements.

MURPHY, P. J. (concurring). While I agree with the majority that plaintiff's damage claim for psychic injury meets the current standards for such recovery, I cannot agree with the majority's reasoning in applying that standard. Therefore, I write separately to address the issue of when damages may be recovered for psychic injuries under existing law.

The emerging body of law governing when damages for psychic injury may be recovered has eliminated the former "bright line" requirement that in all cases plaintiff must show independent physical injuries before such damages may be allowed. *(See, Lynch v Bay Ridge Obstetrical & Gynecological Assocs.,* 72 NY2d 632; *Martinez v Long Is. Jewish Hillside Med. Center,* 70 NY2d 697; *Johnson v State of New York,* 37 NY2d 378; *Battalla v State of New York,* 10 NY2d 237.) In its stead we are left with an amorphous standard, essentially deciding on a case-to-case basis whether the circumstances provide a "guarantee of genuineness" *(see, Ferrara v Galluchio,* 5 NY2d 16, 21), or whether public policy precludes recovery. *(See, Howard v Lecher,* 42 NY2d 109.)

There is little doubt that on this record the psychic injuries claimed by plaintiff are genuine. The only remaining issue is what limits, if any, public policy places on the availability of such damages after *Lynch* and *Martinez.*

This evolving doctrine is grounded upon a line of sharply divided appellate decisions. The Court of Appeals has delineated some recurring factual situations where damages for purely emotional injury will not be permitted on public policy grounds. *(See, Howard v Lecher, supra; Tobin v Grossman,* 24 NY2d 609; *Johnson v Jamaica Hosp.,* 62 NY2d 523; *Kennedy v McKesson Co.,* 58 NY2d 500; *Tebbutt v Virostek,* 65 NY2d 931.) The court has also permitted recovery, in the absence of

physical impact or independent physical injuries, in a series of fact-specific cases that provide little general guidance as to when such damages are available. *(See, Battalla v State of New York, supra; Martinez v Long Is. Jewish Hillside Med. Center, supra; Lynch v Bay Ridge Obstetrical & Gynecological Assocs., supra.)*

The majority is correct that this case involves breach of a duty owed directly to the plaintiff and is not a claim for damages for injuries to the fetus. It is thus clearly distinguishable from the bystander cases such as *Tobin v Grossman (supra)* and *Bovsun v Sanperi* (61 NY2d 219).

I disagree, however, with the majority's view that the failure to notify plaintiff of the results of the pathology test constituted "erroneous advice on which she affirmatively acted in deciding to have an abortion." *(See, Lynch v Bay Ridge Obstetrical & Gynecological Assocs., supra; Martinez v Long Is. Jewish Hillside Med. Center, supra.) Lynch* and *Martinez* are factually distinct from this case in that both of those cases involved a pregnant woman being presented with the choice of having an abortion or possibly bearing a child with birth defects caused by ingestion of a prescription drug contraindicated during pregnancy. Here, unlike in *Lynch* and *Martinez,* the decision to have an abortion had been affirmatively made and that decision was not necessitated by any medical breach. Were this not so, the claim would be entirely barred by *Koehler v Schwartz* (48 NY2d 807). Thus, the exceptional circumstances present in *Lynch* and *Martinez,* the obvious mental anguish of being forced into aborting a wanted child against the plaintiff's religious beliefs, are not present here.

I also disagree with the majority's implicit holding that plaintiff suffered independent physical injuries. In my view, the cramps and pain that plaintiff suffered in connection with the spontaneous abortion are too subjective and short-lived to constitute physical injury. By analogy, the pain and suffering normally associated with childbirth has not been viewed as an independent physical injury. *(See, Tebbutt v Virostek,* 65 NY2d 931; *Ramos v City of New York,* 169 AD2d 687; *Wittrock v Maimonides Med. Center—Maimonides Hosp.,* 119 AD2d 748.)

Thus, this case must be viewed as a claim for damages for psychic injury without independent physical injury. The issue thus becomes what limitations public policy places on the scope of liability for purely psychic harm, where the duty breached is owed directly to the plaintiff, and there is no independent physical injury.

Until it was specifically overruled by *Battalla (supra)*, the rule of *Mitchell v Rochester Ry. Co.* (151 NY 107) that damages are not allowable for mere fright without physical impact, applied to bar most claims for purely psychic harm. In *Mitchell*, the plaintiff, a pregnant woman, was waiting in a crosswalk to be picked up by the defendant railroad when a horse-driven carriage owned by the railroad stopped so close to her that she was standing between the heads of the lead horses. She fainted and suffered a miscarriage, but there was no physical impact. It was held there that if no recovery could be had for mere fright, then no recovery could be allowed for its consequences. The logic behind this conclusion was later questioned in *Comstock v Wilson* (257 NY 231) but the *Comstock* court supported the public policy basis of the ruling *(supra,* at 234-235).

In *Battalla v State of New York (supra)*, the infant plaintiff was permitted to assert a cause of action for emotional damages resulting from being negligently secured in a ski lift at a State-owned resort by a State employee. She became hysterical while in the air, but suffered no physical injuries. The *Battalla* rule was later interpreted as providing an exception to the general rule where the plaintiff is subjected to fear of physical injuries. *(See, Howard v Lecher, supra,* 42 NY2d, at 111.)

It should be noted that in the present case there is no evidence that plaintiff ever was in fear of personal injury. In fact, by her own testimony, the sole basis for her claim for psychic injury, is that her trauma resulted from viewing the aborted fetus hanging into the toilet.

After *Battalla (supra)*, those cases in which the Court of Appeals permitted recovery for psychic harm without independent physical injuries were narrowly drawn. In *Johnson v State of New York (supra)*, the defendant hospital negligently notified the plaintiff that her mother had died when in fact she had not. The court permitted recovery for emotional harm, in the absence of independent physical injuries. However, it should be noted that the court in *Johnson* specifically acknowledged that the common law had long recognized a minority rule exception to the general rule in cases involving erroneous notifications of death of a close relative *(supra,* at 381-382).

In the bystander cases, where a plaintiff is not directly injured but seeks damages for injuries caused to another,

usually a close relative, liability is now limited to those within the zone of injury. *(See, Bovsun v Sanperi, supra.)* However, in cases such as the present case, where the duty is owed directly to the plaintiff and that duty is breached, there is currently no standard by which a court can determine the limits of liability. The rule of *Howard v Lecher (supra)* denying recovery on public policy grounds, offers no guidance as to when public policy denies recovery. In *Howard,* the defendant obstetrician negligently failed to test the expectant plaintiff for Tay-Sachs disease, a genetic disorder for which people of eastern European ancestry are at known risk. The mother gave birth to a child with the disease and argued that she would have aborted the pregnancy had the test been performed. She sought damages for the emotional injury of watching her child degenerate and die. The court held that the duty breached was owed directly to her but denied recovery on grounds of public policy. The court reasoned that allowing recovery would have "inevitably [led] to the drawing of artificial and arbitrary boundaries." (42 NY2d, at 113, *supra.)*

This case illustrates the need for the formulation of a practical rule for cases where the duty breached is owed directly to the plaintiff and the claim asserted is not vicarious. *Bovsun (supra)* established a "zone of injury" rule providing a practical boundary for liability in vicarious injury cases. In cases such as this, the logical progeny of *Howard v Lecher (supra),* what is needed is what the court in *Tobin* called the "most difficult factor", a "reasonable circumscription, within tolerable limits required by public policy, of a rule creating liability." *(See, Tobin v Grossman, supra,* 24 NY2d, at 617; *Bovsun v Sanperi, supra.)* Until we have such a formulation, awards such as presented here must be allowed inasmuch as the circumstances of this case are sufficient to permit the jury to decide whether the claim is spurious. *(See, Kennedy v McKesson Co., supra,* 58 NY2d, at 504-505, citing *Lando v State of New York,* 39 NY2d 803; *Johnson v State of New York, supra; Battalla v State of New York, supra.)*

SULLIVAN, MILONAS and ROSENBERGER, JJ., concur with ASCH, J.; MURPHY, P. J., concurs in a separate opinion.

Orders of the Supreme Court, New York County, entered

March 5, 1990, and June 7, 1990, which, *inter alia,* denied defendants-appellants' motion to dismiss the plaintiff's complaint, but granted the motion to set aside the verdict unless the parties stipulated to the sum of $125,000 as damages, are affirmed, without costs or disbursements.