OPINION OF THE COURT
Memorandum.
Judgment entered December 5, 2006 affirmed without costs.
Judgment entered March 28, 2007 modified by correcting the judgment to provide that the award in the principal sum of $1,000,000 is in favor of plaintiff Lucia Ferreira, individually, only; as so modified, affirmed without costs.
In this medical malpractice action, Lucia Ferreira (hereinafter plaintiff) alleges, insofar as relevant to this appeal, that as a result of the failure of defendant Wyckoff Heights Medical Center properly to evaluate and treat her when she presented at the hospital in approximately the 32nd week of pregnancy with complaints of abdominal pain, she delivered a baby at home on July 1, 1997 unattended by medical personnel. The baby emerged in a footling breech position, and was later determined to have died of asphyxia because its head had been wedged in the birth canal. Plaintiff claims that she suffered great emotional pain as a result of this event and its aftermath. The complaint alleges that plaintiffs baby was born alive, and names the baby’s estate and the baby’s father as coplaintiffs. Wyckoff brought a third-party action against Dr. Irving Spodek, the physician who allegedly treated plaintiff on her final visit to Wyckoff prior to the home birth.
Following pretrial disclosure, Wyckoff and Spodek moved for summary judgment dismissing the complaint on the ground that the baby had been stillborn and, thus, under the holding of Tebbutt v Virostek (65 NY2d 931 [1985]), plaintiff was precluded from claiming damages. At the time the motion was made, the prevailing rule under Tebbutt was that a mother could not recover for emotional injuries when medical malpractice caused a stillbirth, absent a showing that she had suffered a distinct physical injury.
In opposition to the motion, plaintiff contended that the baby had briefly lived. The Civil Court denied the summary judgment motion, concluding that the record presented on the motion did not establish as a matter of law that plaintiff’s baby was stillborn.
Thereafter, the Court of Appeals overruled Tebbutt, holding in Broadnax v Gonzalez (2 NY3d 148, 155 [2004]) that, “even in *95 the absence of an independent injury, medical malpractice resulting in miscarriage or stillbirth should be construed as a violation of a duty of care to the expectant mother, entitling her to damages for emotional distress.” This rule was further refined in Sheppard-Mobley v King (4 NY3d 627 [2005]). There, as the result of an ineffective chemical abortion, an infant was born alive, but with severe impairments resulting from the chemicals that had been administered to the mother. The Court held that Broadnax did not apply because “a child born alive may bring a medical malpractice action for physical injuries inflicted in the womb” (id. at 637). However, the plaintiff mother was permitted to proceed only to the extent that she sought damages for emotional harm that she had suffered as a result of an injury “independent of the birth” (id. at 638). The parties to this appeal appear to accept Broadnax and SheppardMobley as standing for the proposition that where medical malpractice is found to have occurred in connection with a pregnancy and childbirth, a claim for emotional injury lies for a mother only if the baby is stillborn, and that where the baby is born alive, even if the baby lives only for a brief period and never attains consciousness, the mother can recover for emotional harm only if she suffers such harm as the result of an independent physical injury (see generally Mendez v Bhattacharya, 15 Misc 3d 974 [2007]).
In 2005, after the case had been placed on the trial calendar, plaintiffs served an amended expert witness disclosure, a notice of medical report, and a further expert disclosure. This was the first indication that plaintiffs would call an expert witness at trial to establish that plaintiff suffered emotional injuries. In light of the Court of Appeals’ decision in Broadnax, Wyckoff and the third-party defendant moved to preclude plaintiff from eliciting expert testimony at trial, contending that recovery for such injuries depended upon plaintiff proving that the baby had been stillborn, and that plaintiff was judicially estopped from taking this position, which was at odds with the facts as pleaded and as plaintiff had argued in opposition to the motion for summary judgment dismissing the complaint. In an order dated October 5, 2005, the Civil Court (Peter Paul Sweeney, J.) denied the motion and directed plaintiff to amend the complaint to allege that plaintiffs baby was stillborn, finding that the doctrine of judicial estoppel did not apply when a party took contradictory positions within the context of a single lawsuit. Upon re-argument, the court modified its prior ruling by noting that the *96 doctrine of judicial estoppel could apply when contradictory positions were taken in the context of the same lawsuit. However, the court adhered to its prior determination denying the motion, holding that its denial of the original motion for summary judgment had been limited to a finding that neither party had made a prima facie showing as to whether the baby had been stillborn, and that although there were instances where judicial estoppel could apply when contradictory positions were taken in the context of the same lawsuit, inasmuch as Wyckoff and third-party defendant had been given a full opportunity to conduct discovery after plaintiff changed her position, they would not be prejudiced by plaintiffs change in position.
The evidence adduced over the course of the 10-day trial showed that plaintiff was first treated at Wyckoff during her pregnancy in April 1997 when she presented with headache, fever and lower abdominal pain and was hospitalized for six days. On June 18, 1997 plaintiff returned to Wyckoff with complaints of pain, lower abdominal pain, and spotting, and was admitted for the purpose of ruling out labor. She was treated with a drug that relaxes the uterine muscles and is used to stop premature labor, and was placed on a fetal monitor. Also, a group B strep culture was taken, and an antibiotic was administered. Plaintiff was discharged on June 23rd with a diagnosis of cervicitis.
On June 25, 1997 plaintiff was again admitted to Wyckoff with similar complaints. During this admission, she received another drug used to prevent or stop premature labor, and was discharged against medical advice on June 27th.
On June 29, 2007 plaintiff returned to Wyckoff. She was determined not to be in labor, was given another antibiotic for a possible urinary tract infection, and went home.
On June 30, 1997 when plaintiff was approximately 32 to 33 weeks pregnant, she had a triage admission at Wyckoff at 12:25 a.m. A midwife determined that plaintiff was not in labor, and she left.
Plaintiff again reported to Wyckoff later the same morning, between 8:00 and 9:00 a.m. Although there was no hospital record made of this visit, it was undisputed that plaintiff was seen by medical personnel at that time, was given a prescription for Tylenol with codeine written on third-party defendant Dr. Irving Spodek’s prescription pad, and was sent home.
On July 1, while at home, beginning around 9:00 a.m., plaintiff began experiencing an urge to urinate but was unable to empty *97 her bladder. Also, her abdominal discomfort increased. At approximately 12 noon, plaintiff went into precipitous labor. Her brother called for an ambulance, but plaintiffs baby was born foot-first at home. There was testimony that while the baby was only partially emerged, she was pink and kicking. However, the baby’s head became lodged in the birth canal, and by the time the head emerged the baby appeared gray and had no detectable pulse. Efforts at resuscitation, begun at home by an EMS technician, were continued in the ambulance en route to Woodhull Hospital. From the ambulance, the baby was reported by the EMS technician to be “in arrest.” A “Code Blue Flow Sheet” records that, upon arrival at Woodhull Hospital, the baby had no pulse or respirations. Although following suctioning, bagging and intubation, at 1:35 p.m. and again at 1:55 p.m., a pulse, respirations and an EKG rhythm were briefly recorded, by 2:00 p.m. there was no pulse or EKG rhythm. At 2:17 p.m., the baby was pronounced dead. The death certificate states that the baby died, at the age of approximately one hour, of asphyxia due to unattended breech delivery with head wedged in birth canal. However, plaintiff’s expert physician testified that a breech baby born cyanotic with zero pulse and zero respirations approximately half an hour after its feet emerge is stillborn. Thus, there was contradictory evidence presented as to whether plaintiffs baby was born alive or was effectively resuscitated for any period of time.
At the conclusion of testimony, the jury was given a form containing 14 questions, which it answered after three days of deliberations. Most significantly, the jury concluded that Wyckoff had deviated from good and accepted medical practice in sending plaintiff home on June 30, 1997 with a prescription for Tylenol with codeine without properly evaluating, admitting and treating her, and that this was a substantial factor in causing the death of plaintiffs baby; that third-party defendant Dr. Irving Spodek was not the doctor who saw plaintiff on June 30, 1997 and who wrote out the prescription for Tylenol with codeine; that although plaintiff was negligent in failing to seek further medical treatment after she arrived home on June 30, 1997, her negligence was not a substantial factor in bringing about her baby’s premature delivery and death; that Wyckoff was 100% responsible for the death of the baby; that the baby was stillborn; and that plaintiff was entitled to $1,000,000 as compensation for her pain, emotional injuries and/or emotional distress from July 1, 1997 to the date of the verdict (but no compensation for future pain and suffering).
*98 On appeal, Wyckoff argues first that, under the doctrine of judicial estoppel, the Civil Court erred in permitting plaintiff to assert at trial that the baby was stillborn, which position was inconsistent with her original assertion that the baby was born alive. We reject this contention.
While the doctrine of judicial estoppel has been applied to preclude a party “from inequitably adopting a position directly contrary to or inconsistent with an earlier assumed position in the same proceeding” (Maas v Cornell Univ., 253 AD2d 1, 5 [1999], affd 94 NY2d 87 [1999]; see e.g. Nestor v Britt, 270 AD2d 192 [2000]; but see Olszewski v Park Terrace Gardens, Inc., 18 AD3d 349, 350-351 [2005]), the doctrine is applied in New York only where the party to be precluded obtained a ruling in its favor based on the assumed position (see e.g. RGH Liquidating Trust v Deloitte & Touche LLP, 47 AD3d 516 [2008]; 57 NY Jur 2d, Estoppel, Ratification and Waiver § 54). In the instant matter, there was never a judicial determination prior to trial as to whether plaintiffs baby was born alive. Rather, the Civil Court’s denial of the summary judgment motion was based on a finding that the movants had failed to make a prima facie showing on the issue of whether plaintiff’s baby was stillborn. Thus, the denial of the summary judgment motion ultimately did not even rest upon consideration of plaintiffs opposition papers. Moreover, Wyckoff made no showing of prejudice by reason of plaintiff having changed her position; indeed, in claiming damages from emotional distress, plaintiff essentially adopted Wyckoff s and Spodek’s earlier position that plaintiffs baby was stillborn, and, as the Civil Court noted, Wyckoff and Spodek were given a full opportunity to conduct discovery after plaintiff changed her position. Bearing in mind that a trial is supposed to represent a search for the truth, we conclude that the Civil Court’s rulings, permitting amendment of the complaint to assert that plaintiffs baby was stillborn and allowing plaintiff to proceed on this theory at trial, did not violate the doctrine of judicial estoppel.
Second, Wyckoff contends that reversal is required because of the alleged inconsistency between the jury’s finding that plaintiff was negligent in failing to seek further treatment on July 1, 1997 and its conclusion that such negligence was not a proximate cause of the premature delivery and death of the infant plaintiff. Where a jury returns a verdict that a party is negligent, but that the party’s negligence is not a proximate cause of the injuries at issue, reversal is warranted on the grounds that the verdict is inconsistent and against the weight *99 of the evidence “only where the issues are ‘so inextricably interwoven as to make it logically impossible to find negligence without also finding proximate cause’ ” (Jaffier v Wilson, 54 AD3d 725, 726 [2008], quoting Rubin v Pecoraro, 141 AD2d 525, 527 [1988]). The same standard of review applies in medical malpractice cases (e.g. Calderon v Irani, 296 AD2d 778 [2002]; see also Ferrara v Bernstein, 179 AD2d 79, 86-87 [1992]).
Plaintiff went to Wyckoff s emergency room three separate times between June 29, 1997 at 6:00 p.m. and June 30, 1997 at 8:00 to 9:00 a.m. She was not admitted on any of these occasions, and Wyckoff entirely failed to record plaintiffs visit to the hospital on the morning of June 30, 1997, when plaintiff went to the hospital complaining of lower abdominal pain and was given a prescription for pain medication. Had plaintiff been admitted to Wyckoff as a patient on June 30, 1997, the premature footling breech birth of the baby without medical intervention could have been prevented. We therefore conclude that the jury’s finding that although plaintiff was negligent in failing to return to Wyckoff on the morning of July 1, 1997, her negligence was not a substantial factor in bringing about the premature delivery and death of plaintiffs baby, was not “logically impossible” and does not warrant reversal of the jury verdict.
We likewise reject Wyckoff s third argument for reversal, that the jury’s finding of malpractice was against the weight of the evidence. “To establish a prima facie case of liability in a medical malpractice action, the plaintiff must prove that the defendant deviated from accepted practice, and that such deviation proximately caused his or her injuries” (Velonis v Vitale, 57 AD3d 657, 658 [2008]). “A verdict is contrary to the weight of the evidence if ‘the jury could not have reached the verdict on any fair interpretation of the evidence’ ” (Ford v Southside Hosp., 12 AD3d 561, 562 [2004], quoting Nicastro v Park, 113 AD2d 129, 134 [1985]; accord Altman v Alpha Obstetrics & Gynecology, 255 AD2d 276, 277 [1998]). “Where, as here, both parties present expert testimony in support of their positions, it is the province of the jury to determine the experts’ credibility” (Monroy v Glavas, 57 AD3d 631, 632 [2008]; accord e.g. Cohen v Kasofsky, 55 AD3d 859 [2008]; Texter v Middletown Dialysis Ctr., Inc., 22 AD3d 831, 832 [2005]). Since it is the jury that has the opportunity to observe and hear the experts, the jury’s resolution of conflicting expert testimony is entitled to great weight (Angrand v Stern, 8 AD3d 218 [2004]). A jury verdict should be *100 upheld if there exists a valid line of reasoning that supports it (Schwartz v Minkoff, 308 AD2d 484 [2003]).
Plaintiffs expert Dr. Marc Engelbert reviewed plaintiffs medical records in depth, remarking upon various inconsistencies and problems with the records themselves. He noted that plaintiff had been treated for premature labor beginning on June 18, 1997 and testified that a patient who has been treated for premature labor is at high risk for repeat episodes of this condition and should be carefully monitored. It was Dr. Engelbert’s conclusion that plaintiff was showing signs of labor when she was seen at Wyckoff on June 29, 1997 and that it was a deviation from accepted medical practice to discharge plaintiff without trying to stop her contractions at that time; that it was a further deviation to prescribe Tylenol with codeine to plaintiff on June 30, 1997 without fully assessing her; and that the correct mode of delivery for a footling breech baby is by cesarean section, which could have been done if plaintiff had previously been admitted to the hospital. Dr. Engelbert further testified as to the mechanics of death in a baby who is born in a footling breech position and is stuck in that position for a prolonged period of time, and opined, based on a hypothetical question for which a foundation was established, that plaintiffs baby had been stillborn.
Wyckoff s experts testified to their belief that plaintiff had not been in labor when she went to the hospital on June 29 and June 30, 1997. It was their contention that the placenta became infected following those triage visits to defendant hospital, and that the infection caused the precipitous delivery of the baby at home. As to this argument, plaintiffs expert countered with his opinion that the placenta became infected because of its exposure to microbial agents during the time that plaintiff was at home with ruptured membranes and a partially delivered baby as well as during her ambulance transport to the hospital. It was his opinion that, rather than causing the premature delivery, the placenta became infected during the extended delivery process that occurred in non-sterile conditions.
The jury’s finding reflected its decision to resolve the “battle of the experts” in plaintiff’s favor. We find no grounds for reversal of this decision, which was based upon substantial evidence.
We similarly reject Wyckoff s argument that the jury’s determination in favor of third-party defendant Dr. Irving Spodek was against the weight of the evidence. Only if “the evidence so *101 preponderate^] in favor of the [plaintiff] that [the verdict] could not have been reached on any fair interpretation of the evidence” (Lolik v Big V Supermarkets, 86 NY2d 744, 746 [1995] [internal quotation marks omitted]; see Handwerker v Dominick L. Cervi, Inc., 57 AD3d 615 [2008]) should a verdict be set aside as against the weight of the evidence. Although Dr. Spodek was present in Wyckoff during plaintiffs visit there on June 30, 2007, and his prescription pad was used to prescribe Tylenol with codeine for plaintiff, both Dr. Spodek and plaintiff testified that he was not the physician who saw her that day and wrote the prescription. Dr. Spodek also explained how it was possible for another person to use his prescription pad. Wyckoff failed to produce any contradictory evidence. In these circumstances, there is no basis for setting aside the verdict in favor of Dr. Spodek.
Without identifying the remarks it considers objectionable, Wyckoff further argues that the Civil Court committed reversible error by allowing into evidence an unredacted recording of the 911 call made by plaintiffs brother while plaintiff was giving birth at home, contending that the EMS dispatcher’s remarks were neither relevant nor admissible, but were prejudicial. With the exception of a single interjection, the dispatcher’s remarks contained on that recording consist of questioning plaintiffs brother about the situation and instructing plaintiffs brother in how to assist plaintiff pending the arrival of the EMS technicians. Although the dispatcher’s remarks constituted inadmissible hearsay, we conclude that they were principally neutral in their content, and that the dispatcher’s single non-neutral interjection paled in emotional content and was insignificant compared to plaintiffs screams, heard in the background of the 911 tape, as well as in the context of the entire 10-day trial. In this situation, the information contained in the unredacted 911 tape was essentially cumulative and harmless, so that its admission does not constitute reversible error (see Nicolla v Fasulo, 161 AD2d 966 [1990]; Young v Strong, 118 AD2d 974 [1986]).
Finally, defendant argues that the jury verdict of $1,000,000 for past emotional suffering was excessive, and that the Civil Court erred in refusing to reduce the verdict. Plaintiff testified at length concerning the emotional pain she experienced in the months and years following the event at issue, and the distress she experienced because she was unable to afford her baby a proper burial or visit her grave at the cemetery — a species of *102 emotional harm for which New York courts have awarded damages in other contexts (see generally Emeagwali v Brooklyn Hosp. Ctr., 60 AD3d 891 [2009] [an action giving rise to a jury award based on the right of sepulcher only rather than, as herein, on both medical malpractice and the right of sepulcher]; Plunkett v NYU Downtown Hosp., 21 AD3d 1022 [2005]). Expert testimony was also presented concerning plaintiffs pathologic bereavement, with post-traumatic stress disorder and significant depression.
We recognize our duty to consider whether the jury verdict deviated materially from what would be reasonable compensation (see CPLR 5501 [c]):
“Review of damage awards involves the use of two distinctly different standards. One analysis . . . focuses on whether or not the verdict is supported by the evidence. Another line of inquiry . . . requires us to determine what awards have been previously approved on appellate review and decide whether the instant award falls within those boundaries” (Donlon v City of New York, 284 AD2d 13, 18 [2001] [citations omitted]).
Considering the nature of plaintiffs injuries, we conclude that the Civil Court properly refused to reduce the jury’s award for plaintiffs past pain and suffering.
We note, however, that the judgment entered March 28, 2007 awards judgment not only in favor of Lucia Ferreira, individually, but also in favor of Lucia Ferreira, as administrator of the estate of Baby Girl Ferreira, also known as Lucia Fermin. As this does not conform to the jury’s award, which was only in favor of Lucia Ferreira, individually, for the pain and suffering which she suffered, we correct the clerical error by modifying the judgment to provide that the award is only in favor of Lucia Ferreira, individually (see CPLR 5019 [a]; Al-Ev Constr. Corp. v Ahern Maintenance & Supply Corp., 141 AD2d 591 [1988]).
Pesce, PJ., Weston and Golia, JJ., concur.