THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* PAUL L. HAYNER, Appellant.

Argued October 11, 1949; decided December 29, 1949.

*Harry S. Travis* for appellant.   I. The People failed to establish the crime of murder in the first degree.   (*People* v. *Crum*, 272 N. Y. 348; *People* v. *Cashin*, 259 N. Y. 434; *People* v. *Guadagnino*, 233 N. Y. 344; *People* v. *Becker*, 210 N. Y. 274; *People* v. *Fanning*, 131 N. Y. 659.)   II. The corpus delicti was not established in conformity with law..   (*People* v. *Cuozzo*, 292 N. Y. 85; *People* v. *Benham*, 160 N. Y. 402; *Ruloff* v. *People*, 18 N. Y. 179; 7 Wigmore on Evidence [3d ed.], § 2071; *People* v. *Fitzgerald*, 288 N. Y. 58; *People* v. *Popoff*, 289 N. Y. 344.)

*Robert O. Brink, District Attorney (Samuel W. Bernstein* of counsel), for respondent.   Guilt was established beyond a reasonable doubt.   (*People* v. *Place*, 157 N. Y. 584; *People* v. *Conroy*, 153 N. Y. 174; *People* v. *Del Vermo*, 192 N. Y. 470; *People* v. *Hawkins*, 109 N. Y. 408; *People* v. *Barnes*, 202 N. Y. 77.)

LOUGHRAN, Ch. J.   At a Trial Term of the Supreme Court held in Broome County, the defendant on February 22, 1949, was convicted of the murder of a male child of which his fourteen-

year-old daughter had been delivered by him early on the morning of May 17, 1948. Soon after that birth, the defendant summoned a doctor who took him and his daughter to a hospital where injuries done to her by the delivery were repaired. Meantime in the reception room of the hospital the defendant was questioned by the Sheriff of Broome County and by one of his deputies. The Sheriff says the defendant there " stated that his daughter had given birth to a baby and he had pulled the top of the baby's head off." According to the deputy sheriff, the defendant on the same occasion said: " I deliberately killed that baby. I didn't want to bring any disgrace upon the family." A little later, the Sheriff and three deputies accompanied the defendant to his home in the town of Chenango where he pointed out a grave from which one of the deputies removed a male baby with the umbilical cord still attached and wound around the neck loosely.

The defendant next (about 10 o'clock of the same morning) made at the Sheriff's office a further statement which was read and sworn to by him after it had been written down by a deputy sheriff. In part that statement is as follows: " At about 11 P.M. yesterday my daughter Kaye started to have labor pains, same continuing on until about 5:15 A.M. on this date [May 17, 1948] at which time the baby started to be born. As the head came out my wife and I tried to help it along as it came very slowly and Kaye was in terrible pain screaming for help and bleeding badly. As I pulled on the head, the skin came off from a portion of the skull on top of the head and some of the brains came out running on the bed. The baby started to cry just after being born. I then cut the umbilical cord, from the mother using a pair of shears. I then took the umbilical cord which was still attached to the baby, from the mother, and wound it tightly around the baby's neck for purpose of strangulation (drew it tightly) and the baby stopped crying. The baby was being born over a period of 45 minutes to one hour. Some time after I wrapped the baby in a turkish towel, carried it across the driveway a few rods from the house * * * and buried it in a shallow hole covering same with dirt and three large stones. * * * Just after the baby had emerged completely from its mother's womb, I tied the cord about its neck probably within

10 or 12 seconds. Then within 20 or 30 seconds it stopped crying and I believe it was dead. There was not motion at that time. Then about 10 or 12 minutes I carried it away and buried it. * * * I'm admitting to having intercourse with my daughter. I'm admitting to that.''

The defendant's wife and daughter were witnesses for the People. The wife said the defendant had been sleeping with the daughter for a time before the daughter became pregnant and the daughter said he had sexual intercourse with her during that period. Thus there was an adequate basis for a finding by the jury of an emotion in the defendant that might well have led him to the commission of the crime charged. Moreover, he had an opportunity to commit that crime and the dead body of the child was found where he said he had buried it. These items of evidence plus the defendant's confessions were not, however, sufficient warrant for the verdict herein. For the People were bound to establish by proof outside the confessions (Code Crim. Pro., § 395) that the child was born alive in the legal sense, that is, had been wholly expelled from its mother's body and possessed or was capable of an existence by means of a circulation independent of her own (see *Evans* v. *People,* 49 N. Y. 86, 90; 2 Bishop on Criminal Law [9th ed.], p. 478; Sir James Stephen's Digest of the Criminal Law [7th ed.], p. 218; 9 Halsbury's Laws of England [1st ed.], p. 571). '' The true test of separate existence in the theory of the law (whatever it may be in medical science) is the answer to the question ' whether the child is carrying on its being without the help of the mother's circulation.' '' (1 Russell on Crime [9th ed.], p. 349, note u. See the cases there cited.)

The defendant and his wife were the only persons who were with their daughter at the time her child was born. As witnesses for the People, the wife and daughter said they never saw the child and did not hear it cry. The defendant did not take the stand. Consequently, the People were constrained to attempt the necessary corroboration of his confessions solely through medical opinions that were based upon nothing more than a post-mortem examination.

Four physicians were witnesses for the People. One of them performed an autopsy upon the body of the child. In substance

his findings were as follows: There was one faint bruise on the right side of the neck and two faint bruises on the left side thereof; these were the only marks on the body; there was no ring of discoloration around the neck; there was a scalp wound about an inch and a half in diameter which, however, was no part of the cause of death; there was no skull fracture; no hemorrhage in the skull; no evidence of injury to brain or skull; no hemorrhage in the brain; nothing abnormal in the conjunctiva of the eyes; no discharge of any kind from the nose or mouth; no foreign object in any part of the body; no evidence of any fracture of the neck; there was a slight blue cast under the nails, but no blueness of the face such as often results from suffocation; the color of the skin was normal except for the three faint bruises on the neck.

On the strength of the autopsy report alone, the medical expert witnesses called by the People took it upon themselves to declare their ability to express "with reasonable certainty" an opinion to this effect: (1) The child was born alive and had a living existence separate and independent from its mother; and (2) the cause of death was an external force which shut off the air supply to the lungs. The pathologist who made the autopsy report gave this testimony: "Q. Will you tell us whether in your post-mortem examination findings * * * there is positive evidence that this baby suffered from traumatic asphyxia as the result of the air supply being shut off? * * * A. Yes, there is. Q. What is that evidence? A. The evidence is that the lungs were fully expanded, but even more than that, there was interstitial emphysema of the lungs. Q. By that you mean what? A. Tearing of the wall sacs and escape of air into the connective tissue of the framework of the lung." But the People admitted the absence of hemorrhage in the wall sacs and connecting tissue of either lung — a strong circumstance on the side of the defendant since bleeding naturally follows rupture of a blood vessel of a living person. The expansion of the lungs was of no great moment because the legal test of live birth — possession by the child of a separate·circulation — made irrelevant the question whether the child had breathed or not (see Winfield, "The Unborn Child", 8 Cambridge L. J., 76, 79;

Stephen's Digest of the Criminal Law, *supra*; 21 Am. & Eng. Encyc. Law [2d ed.], p. 102).

The foregoing, we believe, is a sufficient analysis of the case for the People. The testimony of their medical experts was necessarily of slight or merely conjectural significance. For here no one claiming to be an eye or ear witness came forth and, where that is the case evidence of live birth precedent to speedy death is of a nature practically impossible to medical science (see Atkinson, " Life, Birth and Live-Birth ", 20 Law Quarterly Rev. 134, 146, 149). Hence we are ourselves wholly unconvinced that the jury were justified in finding the fact of live birth to have been established beyond a reasonable doubt, and, this being so, the conviction of the defendant cannot be allowed to stand (*People* v. *Crum,* 272 N. Y. 348, 350).

The judgment of conviction should be reversed and a new trial ordered.

LEWIS, CONWAY, DESMOND, DYE, FULD and BROMLEY, JJ., concur.

Judgment of conviction reversed, etc.