OPINION OF THE COURT
William J. Davis, J.
On May 16, 1986, at approximately 8:30 p.m., Ms. Brigette Garrett was walking along West 127th Street and Seventh Avenue in New York. Several shots fired by the defendant at another individual struck Ms. Garrett several times, wounding her in the abdomen. At the time of the shooting, Ms. Garrett *516 was approximately 28 weeks pregnant. The bullets penetrated the placenta, disrupting the oxygen flow to the infant. Following the shooting, she was transported by police vehicle to Harlem Hospital where an emergency Caesarean section was performed. Ms. Garrett gave birth to a premature infant daughter. The child was born limp and was immediately placed on a ventilator due to the underdevelopment of her lungs. She died some 36 hours later of what was diagnosed as hyaline membrane disease,[1] a condition common to babies of premature birth.
The defendant apparently learned of the results of his actions while watching a television news report. Defendant ultimately surrendered to the police and admitted to his actions.
Defendant Leonard Hall is charged, inter alia, with murder in the second degree (Penal Law § 125.25). He moves to dismiss the indictment on the ground that the evidence submitted to the Grand Jury was insufficient. Specifically, defendant contends that the indictment is insufficient on its face because there was no evidence before the Grand Jury proving that the corpus in this case was ever "legally” born under New York law.
The court, therefore, is called upon to decide whether the defendant can be charged with murder in the second degree. This presents the novel issue of whether a 28-week-old fetus surgically removed from its mother and immediately placed on a ventilator is a "person” within the meaning of Penal Law § 125.05.
Penal Law § 125.25 states in pertinent part as follows:
"A person is guilty of murder in the second degree when:
"1. With intent to cause the death of another person, he causes the death of such person or of a third person.”
The term "person” is defined in Penal Law § 125.05 (1) as "a human being who has been born and is alive.”
Section 125.05 (1) basically codifies the common law. In the mid-17th century, the "born alive” rule was first espoused. An early explanation of this rule was the following: "If a woman *517 be quick with childe and by potion or otherwise killeth it in her wombe, or if a man beat her whereby the childe dyeth in her body and is delivered of a dead childe this is a great misprision (misdemeanor) and no murder, but, if the childe be born alive and dyeth of the potion or battery or other cause this is murder.” (73 Coke, Institutes, at 58 [1648].)
The "born alive” rule was followed by the Court of Appeals in the landmark decision People v Hayner (300 NY 171 [1949]). Both defendant and the People rely upon Hayner in support of their respective positions.
In Hayner (supra), the Court of Appeals reversed a murder conviction on the ground that there was no proof aside from the defendant’s confession that the child had been born alive. It held that before a baby could be deemed to have been born alive, there must be proof that the baby had been wholly expelled from the mother and capable of circulation independent from that of its mother. (Supra, at 176.)
The court in Hayner was confronted with the murder prosecution of a father for the death of his newborn infant (which was also his grandchild). In Hayner, the father of the newborn had strangled it as it emerged from its mother’s womb. He later admitted his actions to the police. At the time of the delivery, only the father and the infant’s mother were present. At trial, both the defendant’s wife and daughter testified that they never saw the child nor heard it cry. The medical testimony presented was twofold: (1) that the child was born alive and had a living existence separate from its mother; and (2) that the cause of death was an external force which shut off the air supply to the lungs. (Supra, at 175.)
Hayner held that there was no evidence that an infant had been born alive, since there were no eyewitnesses to the infant’s birth and subsequent ability to cry or breathe on its own. The court reasoned that "[t]he testimony of [the] medical experts was necessarily of slight or merely conjectural significance. For here no one claiming to be an eye or ear witness came forth and, where that is the case evidence of live birth precedent to speedy death is of a nature practically impossible to medical science” (300 NY, at 176).
Defendant argues that the infant’s reliance upon a ventilator rendered it incapable of an independent existence and was, therefore, not born alive. This court disagrees.
This court finds that under the two-pronged test enunciated in Hayner (supra), the 28-week-old infant in the instant case *518 was a "person”. The infant was wholly expelled from its mother by means of Caesarean section. Secondly, the infant had a circulation independent from that of its mother. Although born limp, the infant was breathing at the time of delivery and continued to breathe for 36 hours. Unlike Hayner, there were eye and ear witnesses to the condition of the infant at birth. These witnesses included the attending physician, who observed the live birth; a physician who attended the infant while on the ventilator; and the medical examiner, who performed an autopsy upon the infant and determined the cause of death to be hyaline membrane disease. Given the court’s reasoning in Hayner, it is clear that this 28-week-old infant was born alive and was a "person” within the meaning of Penal Law § 125.25.
This court cannot accept defendant’s contention that the infant’s reliance upon a ventilator rendered her incapable of independent existence and, therefore, not "alive”.
Within the past 37 years since the court’s decision in Hayner (supra) machines that artificially maintain cardiorespiratory functions have come into widespread, if not routine, use.[2] As a result of the great strides made in this field, the medical community and the courts have recognized that the traditional "vital signs” — breathing and heartbeat — are not independent indicia of life, but instead are part of an integration of functions in which the brain is dominant.[3]
As a result of this recognition, it has been held that, when artificial means are employed to maintain breathing or heartbeat, "death” occurs when there is an irreversible cessation of *519 the functioning of the entire brain (People v Eulo, 63 NY2d 341 [1984]). Here, there was breathing and a heartbeat to maintain. There was life which was assisted by means of a ventilator. That life ceased when there was cessation of all functioning of the brain. It was at that time, some 36 hours later, that the infant was declared dead.
To hold that since the infant was assisted by artificial means she was incapable of sustaining independent life would totally contradict the medical evidence that there was life which could be sustained. It would further contradict the medical realities.
Defendant’s motion to dismiss the indictment based upon the insufficiency of the evidence presented to the Grand Jury is denied.

. More commonly known as respiratory distress syndrome. The clinical signs include delayed onset of respiration, usually present in infants of premature births who have not matured to the point where their lungs can function on their own, resulting in collapse of the alveoli with consequent cyanosis and hypoxia. (Taber, Encyclopedic Medical Dictionary [15th ed 1985].)

. See generally, Report of President’s Commission for Study of Ethical Problems in Medicine and Biomedical and Behavioral Research on Defining Death: Medical, Legal and Ethical Issues in Determination of Death (1981) (hereinafter Commn Report), US Supt Docs, No Pr 40.8; ET 3/D34, at 13-42; Abram, Need for Uniform Law on the Determination of Death, 27 NY L Sch L Rev 1187, 1187-1193; Compton, Telling the Time of Human Death by Statute: An Essential and Progressive Trend, 31 Wash & Lee L Rev 521, 521-532; Capron & Kass, A Statutory Definition of the Standards for Determining Human Death: An Appraisal and. a Proposal, 121 U of Pa L Rev 87, 87-92.

. See, Commn Report, op. cit., n 3, at 21-29; Biorck, When is Death?, 1968 Wis L Rev 484; Report of Ad Hoc Committee of Harvard Medical School to Examine the Definition of Brain Death, A Definition of Irreversible Coma, 205 JAMA 337, 338. The initial problem for doctors was to devise a technical means of verifying when the entire brain ceases to function. Unlike tests for determining the cessation of breathing and heartbeat, more sophisticated means were necessary to measure the less obvious functioning of the brain.