OPINION OF THE COURT
Joseph D. Mintz, J.
All defendants move for summary judgment on the grounds that the complaint fails to state a cause of action recognized in New York. In addition, defendants Children’s Hospital of Buffalo, Inc. (Children’s) and MDS Diagnostic Imaging Group, Inc. (MDS) move for summary judgment on the grounds that the allegations of malpractice against them, even if true, did not proximately cause the injuries complained of.
The complaint states three theories of recovery. The first is on behalf of Derek Kaniecki for wrongful death and personal injuries. The second, based in negligence, is on behalf of both *411 parents for mental distress. The third, based upon the theory of "zone of danger,” is on behalf of Mrs. Kaniecki for mental distress.
Defendant Yost and his professional corporation rendered obstetric care to Mrs. Kaniecki during her pregnancy with and birth of Derek. During the course of her pregnancy, Mrs. Kaniecki had four ultrasound examinations for which defendant MDS rendered ultrasound reports. Based upon these reports and also Dr. Yost’s examinations of Mrs. Kaniecki, Dr. Yost determined that Mrs. Kaniecki was carrying a large fetus for its gestational age. Dr. Yost noted that Mrs. Kaniecki should be watched for cephalopelvic disproportion. On January 17, 1990, Mrs. Kaniecki was admitted to Children’s for induction of labor by use of the medication Pitocin. Upon her admission, she was examined by Dr. Fraas-Burns, an employee of defendant Children’s, who determined that Mrs. Kaniecki’s pelvis was adequate to deliver the baby, and who administered the Pitocin, as ordered by Dr. Yost.
At 5:00 p.m. on January 17, 1990, Mrs. Kaniecki began to deliver Derek. After emergence of his head, the head retracted back into the uterus, indicating that his shoulders were stuck. At this point, there was a strong fetal heartbeat, and pulsating in the umbilical cord. From 5:05 p.m. to 5:24 p.m., eight physicians attempted to deliver Derek. Upon his full expulsion, Derek was no longer viable. At no time did he breathe on his own, outside his mother. Upon autopsy, Derek weighed 12 pounds, 12 ounces.
I.
There is no cause of action on behalf of a baby who is stillborn. (Endresz v Friedberg, 24 NY2d 478 [1969].) Plaintiffs contend that since Derek was alive during the birth process, he was not stillborn, and is entitled to maintain a separate cause of action for wrongful death. Defendants maintain that the child was stillborn, based upon the definition of fetal death in Public Health Law § 4160 (1): "[D]eath prior to the complete expulsion or extraction from its mother.” Public Health Law § 4160 is intended for record keeping and vital statistic purposes.
There is no reported case which defines stillborn, fetal death, or live birth for the purpose of maintaining a wrongful death action. New York cases decided under Endresz (supra) involve the death of the fetus prior to delivery. However, the Court of Appeals has addressed the issue in the context of homicide in *412 People v Hayner (300 NY 171 [1949]) and also in determining the constitutionality of abortion statutes (Byrn v New York City Health & Hosps. Corp., 31 NY2d 194 [1972]). In both cases, the Court chose among three possible definitions of live birth. The first, which is adhered to in Alabama and California (see, Singleton v State, 33 Ala App 536, 35 So 2d 375 [1948]; People v Chavez, 77 Cal App 2d 621, 176 P2d 92 [1947]), defines live birth as birth after the child has reached that state of development where it is capable of living an independent life as a viable being. Alabama also recognizes the existence of a cause of action for wrongful death at any time after viability of the fetus. (Eich v Town of Gulf Shores, 293 Ala 95, 300 So 2d 354 [1974].) While California does not recognize such a cause of action for wrongful death (Norman v Murphy, 124 Cal App 2d 95, 268 P2d 178 [1954]), in the context of homicide, a baby alive during the birth process is a person. (People v Chavez, supra.) The second definition requires a separate and independent existence from the mother after the child has been completely expelled from the mother’s body. The third theory adds the requirement of independent circulation or respiration. The Court of Appeals in Hayner adopted the third theory for purposes of homicide. In Byrn, the Court discussed the theory under common law, requiring a complete extrusion. The Court then went on to note that "if a child was killed during the process of birth it was not murder at common law, since the whole of the child must be extruded before it becomes a person.” (Byrn v New York City Health & Hosps. Corp., supra, at 203.)
Whether the second or third theory is the appropriate definition of live birth, it is clear that the Kaniecki baby was not born alive. There is no evidence that the child had any independent existence, independent circulation or independent respiration following full expulsion from the mother at 5:24 p.m. While there may be evidence of life of the fetus during childbirth, only evidence of life after full expulsion will confer person status upon the fetus enabling the maintenance of a wrongful death cause of action. Under these facts, plaintiffs cannot maintain a wrongful death cause of action. Interestingly, had defendants been more successful in expelling the child prior to 5:24 p.m., and if the child had lived, however briefly, before dying, the assertion of a wrongful death cause of action would be permitted. However, the birth effort exceeded the duration of the child’s pulse through the umbilical cord. As a result, no wrongful death cause of action may be maintained.
There is no question that the facts of this case and the result which must be reached under Endresz (supra) regarding the *413 wrongful death cause of action compel reconsidering the law so as to allow such causes of action on behalf of viable stillborn fetuses. While this court considers this to be a wiser rule (see, Tebbutt v Virostek, 65 NY2d 931, 937-938, n 3 [1985] [Jasen, J., dissenting]), the court is bound by the Court of Appeals decision in Endresz, and only the Court of Appeals or the Legislature may reconsider that ruling. (See, La Page v Di Costanzo, 194 AD2d 977, 977-978 [3d Dept 1993].) For these reasons, plaintiffs’ second cause of action and those portions of the first, third and sixth causes of action pertaining to the injuries to Derek are dismissed.
II.
While Endresz (supra) permitted a cause of action on behalf of the mother for her physical and emotional harm related to the loss of the fetus, Tebbutt v Virostek (65 NY2d 931 [1985], supra) made clear that a cause of action for emotional damages must be predicated upon a breach of duty owed to the mother separate from the duty owed to the child, which breach proximately causes a physical injury. A plaintiff mother cannot recover for injuries which are caused by the breach of duty owed to the fetus. (Scott v Capital Area Community Health Plan, 191 AD2d 772 [3d Dept 1993].) While it is a fairly simple matter to determine the existence of a separate duty owed to the mother in the context of a motor vehicle accident, as in Endresz, or when the plaintiff alleges a negligently performed abortion, later resulting in the delivery of a stillborn fetus (Ferrara v Bernstein, 179 AD2d 79 [1st Dept 1992]), it is much more difficult to separate the duty owed to the mother by her treating obstetrician from the duty he or she may owe to the unborn fetus. The Court of Appeals has done so in Martinez v Long Is. Jewish Hillside Med. Ctr. (70 NY2d 698 [1987]) and in Lynch v Bay Ridge Obstetrical & Gynecological Assocs. (72 NY2d 632 [1988]). In Martinez, the Court found that incorrect advice regarding the effect of medication upon her fetus which caused her to undergo an abortion was the breach of a duty owed to her and allowed a cause of action for the emotional harm of discovering she had aborted a perfectly healthy fetus. In Lynch, the Court found that incorrect information that plaintiff was not pregnant and the prescription of a fetus-threatening drug was the breach of a duty owed to her and allowed a cause of action for the physical and emotional effects of undergoing an abortion rather than risking giving birth to a congenitally defective child. In both cases, the Court found *414 that the damages flowed from acting upon the erroneous advice given to the plaintiff, and the Court determined that giving correct advice to the plaintiff was part of the duty owed directly to the plaintiff. In making this determination, the Court found that the harm to the fetus in both cases was indirect and a consequence of the breach of duty to the plaintiff.
When the alleged malpractice occurs during the delivery of the child, the physical injury to the mother must be separate from that which occurs in any normal childbirth, and must flow directly from the claimed malpractice. (Farago v Shulman, 104 AD2d 965 [2d Dept 1984], affd 65 NY2d 763 [1985]; Sceusa v Mastor, 135 AD2d 117 [4th Dept], l lv dismissed 72 NY2d 909 [1988].) Plaintiffs claim that the defendants’ failure to diagnose macrosomia and the concurrent shoulder dystocia caused a variety of physical injuries including rash and edema, loss of blood due to a particularly large episiotomy, severe pain and bruising occasioned by the attempts to dislodge the baby’s shoulders from the mother’s pelvis, and plaintiff’s own fear of death.
There is no dispute that the rash and edema preceded the inducement of labor, and that plaintiff also suffered from a rash and edema in her first pregnancy. These are not injuries flowing from any breach of duty by defendants. The allegations of loss of blood can be considered a physical injury to the mother flowing from the defendants’ malpractice if shown to be beyond normal childbirth. (Stiles v Sen, 152 AD2d 915 [4th Dept 1989].) However, the blood loss in this case was the result of a large medial episiotomy, which has been held to be part of the normal childbirth process. (Sceusa v Mastor, supra; Farago v Shulman, supra.)
During the 20 minutes of the attempts to extract the child, dislodge his shoulders and break his clavicle to facilitate his removal, plaintiff was subjected to bruising and the fear of danger to her own life. According to the affidavit of her expert witness, these are not a part of normal childbirth. The expert further states that macrosomia, from which plaintiff suffered, can be life-threatening to the mother. This fear of death can be separate physical injury to plaintiff flowing from the breach of duty owed to her by defendants. (Prado v Catholic Med. Ctr., 145 AD2d 614 [2d Dept 1988].) Therefore, the complaint, the bill of particulars and the affidavits in opposition to summary judgment set forth sufficient separate physical injuries to the mother as a result of the breach of duty owed to her by defendants, and her cause of action for emotional as well as *415 physical damages is permissible. For these reasons, the portions of the first cause of action pertaining to plaintiff Gloria Kaniecki, the fourth cause of action, the portions of the fifth cause of action pertaining to plaintiff Gloria Kaniecki, and the portions of the sixth cause of action pertaining to plaintiff Gloria Kaniecki will remain.
III.
Finally, plaintiffs raise a "zone of danger” theory of recovery for emotional damages, as set forth in the Court of Appeals decision in Bovsun v Sanperi (61 NY2d 219 [1984]). While that theory has been upheld in other cases involving the death of a fetus (see, e.g., Khan v Hip Hosp., 127 Misc 2d 1063 [Sup Ct, Queens County 1985]), the Fourth Department has held it inapplicable to an action by a mother against her obstetrician for damages flowing from the death of the child delivered, holding that the legal fiction of a "duty” created in zone of danger cases is unnecessary and inappropriate when a duty was already owed by defendants to the mother. (Sceusa v Mastor, 135 AD2d 117, 120 [4th Dept], lv dismissed 72 NY2d 909 [1988], supra.) Any fear of death or bodily injury to the mother can be an element of the mother’s action for physical and emotional injuries, and need not be raised as a "zone of danger” cause of action.
The plaintiff father, however, does not meet the tests for a "zone of danger” claim. He was not placed in any fear for his own life. Furthermore, he did not suffer any physical injury. For that reason, all portions of the fifth cause of action pertaining to plaintiff father are dismissed.
IV.
Defendants MDS and Children’s also claim summary judgment on the basis of a lack of any proximate cause of plaintiff’s injuries flowing from any alleged negligence by them. They base this claim on the argument that even if they breached some duty to the plaintiff with respect to properly estimating the size of the fetus, testimony of defendant Yost shows that he did not rely on any information provided by them in formulating his own estimation of the size of the fetus. While defendant Yost may have so testified at his examination before trial, his actions in seeking the ultrasound evaluations from MDS and from relying on the assistance of residents and other personnel from Children’s belies his testimony. His actions, and the reasonable inferences to be drawn from them, *416 create a factual issue as to proximate cause. Summary judgment cannot be sustained on this ground.
Finally, defendants MDS and Children’s argue no breach of any duty as a matter of law. Defendant MDS states that fetal weight was not requested by defendant Yost so their failure to report fetal weight could not be a breach of a duty. The affidavit of plaintiffs expert asserts otherwise. This creates a sufficient factual issue to deny summary judgment.
Defendant Children’s states that all of its acts were under the direction of defendant Yost. While the hospital need not intervene in the relationship between the patient and her private physicians, the hospital owes an independent duty to the plaintiff to perform without negligence. (Pollicina v Misericordia Hosp. Med. Ctr., 158 AD2d 194 [1st Dept 1990].) Plaintiffs expert raises deviations in the performance of the employees of defendant Children’s both prior to and during the delivery process. While defendant Children’s may ultimately be able to show at trial that each act was under the strict orders of defendant Yost, and thus avoid liability, there is no indication that this is the case as a matter of law.
For these reasons, the defendants’ motions are granted in part and denied in part.