UNITED STATES, Appellee,

v.

Sharon Y. NELSON, Hull Maintenance Technician Third Class, U.S. Navy, Appellant.

No. 00–0010.
Crim.App. No. 97–1978.

U.S. Court of Appeals for the Armed Forces.

Argued May 4, 2000.

Decided Aug. 24, 2000.

EFFRON, J., delivered the opinion of the Court, in which CRAWFORD, C.J., SULLIVAN and GIERKE, JJ., and COX, S.J., joined.

For Appellant: *Captain Curtis M. Allen,* USMC (argued).

For Appellee: *Lieutenant James E. Grimes,* JAGC, USNR (argued); *Colonel Kevin M. Sandkuhler,* USMC, and *Commander Eugene E. Irvin,* JAGC, USN (on brief).

Judge EFFRON delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to her pleas, of making a false official statement and involuntary manslaughter, in violation of Articles 107 and 119, Uniform Code of Military Justice, 10 USC §§ 907 and 919. She was sentenced to confinement for 18 months, forfeiture of all pay and allowances, and reduction to pay grade E–1. The convening authority approved the sentence as adjudged and suspended the confinement and forfeitures for a period of 1 year. The Court of Criminal Appeals affirmed. 52 MJ 516 (N.M.Ct.Crim.App.1999).

On appellant's petition, we granted review of the following issues:

I. WHETHER THE LOWER COURT ERRED BY ADOPTING A "VIABILITY" STANDARD FOR DETERMINING WHETHER AN INFANT IS "BORN ALIVE" FOR PURPOSES OF A VIOLATION OF ARTICLE 119, UCMJ, MANSLAUGHTER.

II. WHETHER THE LOWER COURT ERRED BY REFUSING TO CONSIDER LEARNED MEDICAL TREATISES, NOT SUBJECT TO REASONABLE DISPUTE, AS OUTSIDE THE RECORD OF THE CASE IN FORMING ITS LEGAL TEST FOR WHETHER AN INFANT IS "BORN ALIVE."

III. WHETHER THE LOWER COURT ERRED BY USING THE DEFINITION OF "LIVE BIRTH" FROM STATE VITAL STATISTICS RECORDATION STATUTES AND A STATE CIVIL STATUTE REGARDING ABORTION AS THE DEFINITION OF "BORN ALIVE."

IV. WHETHER THE LOWER COURT ERRED IN DECIDING THAT APPELLANT WAS CULPABLY NEGLIGENT IN GIVING BIRTH WITHOUT MEDICAL ASSISTANCE.

V. WHETHER THE LOWER COURT ERRED IN HOLDING THAT A MOTHER IN THE THROES OF CHILDBIRTH HAS A DUTY TO EVALUATE THE CONDITION OF HER INFANT AND TO PROVIDE MEDICAL ASSISTANCE TO THE INFANT.

VI. WHETHER THE EVIDENCE IS LEGALLY SUFFICIENT TO FIND APPELLANT GUILTY OF INVOLUNTARY MANSLAUGHTER IN VIOLATION OF ARTICLE 119, UCMJ.

VII. WHETHER THE DECISION OF THE LOWER COURT VIOLATES DUE PROCESS AND THE *EX POST FACTO* CLAUSE OF THE UNITED STATES CONSTITUTION BY JUDICIALLY ENLARGING A LEGAL RULE AND APPLYING THE ENLARGEMENT RETROACTIVELY.

VIII. WHETHER THE LOWER COURT ERRED IN FAILING TO FIND THAT THE EVIDENCE WAS INSUFFICIENT TO PROVE APPELLANT MADE ANY FALSE OFFICIAL STATEMENTS BECAUSE THE MANUAL FOR COURTS–MARTIAL CLEARLY INDICATES THAT ARTICLE 107, FALSE OFFICIAL STATEMENT, DOES NOT APPLY TO STATEMENTS MADE BY AN ACCUSED DURING AN INTERROGATION.

For the reasons discussed below, we affirm.

I. APPLICATION OF THE "BORN ALIVE" TEST TO THE UNLAWFUL KILLING OF "A HUMAN BEING" (ISSUES I, II, III, AND VII)

### A. *Legal Context*

Appellant was convicted of involuntary manslaughter of her newborn child under Article 119(b), UCMJ. The specification of which appellant was found guilty alleged that the child died as a result of appellant's culpable negligence in that appellant failed "to provide medical assistance to" the child and "to take steps to ensure that medical treatment and assistance were available and provided to" the child. The prosecution contended at trial that the child passed through the birth canal alive and that the infant had no congenital birth defects that would have caused death.

■ Under Article 119(b) of the UCMJ, involuntary manslaughter includes the unlawful killing of "a human being" by culpable negligence. The term "human being" is not defined or explained in the text of the statute itself nor in the legislative history. In most homicide cases, the definition of "human being" is not at issue. As the Air Force Board of Review observed in *United States v. Gibson*, 17 CMR 911, 935 (1954):

> The phrase "human being" *ordinarily* has a universal meaning in the lay mind as well as the legal. In the ordinary case where the evidence relates to a dead body of such age or physical development that there can be no question but that the dead person had a separate and independent life prior to death, there is no need or advantage to giving amplifying or clarifying instructions defining the term "human being".... "Words generally known and in universal use do not need judicial definition." (*U.S. v. Shepard*, (No. 343), 1 USCMA 487, 4 CMR 79).

Where, however, the evidence raises an issue as to whether a child "had a separate and independent life prior to death," it is necessary to define the term "human being" in the course of providing instructions to the members on the issue of whether a "human being" was killed.

In *United States v. Robbins*, 52 MJ 159, 163 (1999), we noted that "Congress intended that Articles 118 and 119 be construed 'with reference to the common law.' *See United States v. Harrison*, 16 USCMA 484, 485, 37 CMR 104, 105 (1967)." English common law, like Article 119, treated homicide as the unlawful killing of a human being. A human being, at common law, was defined as having been "born alive." *Robbins, supra*, citing *Gibson, supra* at 923.

The Board of Review in *Gibson* noted:

> The modern common law view in English jurisprudence is stated in Halsbury's Laws of England, Second Edition, Volume 9, Section 732, page 427, as follows:
>
> > "A child is not considered in law to be completely born, so as to be the subject

of a charge of murder or manslaughter until the whole body of the child is brought alive into the world having an independent circulation, and breathing or capable of breathing, from its own lungs, so that it possesses, or is capable of, an existence independent of connection with its mother. But the child may be completely born although the umbilical cord not be severed."

17 CMR at 924. The Board cited the following passage from the case of *People v. Hayner*, 300 N.Y. 171, 90 N.E.2d 23 (1949), as being "in harmony with nineteenth and twentieth century applications of modern common law legal principles in English jurisprudence":

> For the People were bound to establish ... that the child was born alive in the legal sense, that is, had been wholly expelled from its mother's body · and possessed or was capable of an existence by means of a circulation independent of her own[.]

17 CMR at 926. The Board concluded:

> In our opinion, the test in the case of *People v. Hayner, supra*, as to separate existence is a sound application of common law legal principles in the light of modern advancements in medical knowledge of human physiology.

### B. *Factual Background*

#### 1. *Facts surrounding the offense*

Appellant had hidden her pregnancy from everyone around her. One night, while most of her shipmates were ashore on leave, appellant delivered her full-term child in isolation on board the ship. Without examining the child's physical condition, appellant left her ship, carrying the child and the sheets used during delivery in a plastic bag with holes punched in it. Twelve hours later, appellant took herself and the child to a civilian hospital; appellant was admitted and treated, but the child was dead.

#### 2. *Events at trial*

The primary issue at trial was whether appellant had been culpably negligent in de-livering her child without medical assistance and in not providing such assistance thereafter. Although the defense did not expressly contend that the child had not been born alive, the military judge recognized that the issue of whether the child had been born alive was raised by the evidence and was part of the "nature of the charges in this case."

Appellant, for example, testified that her child did not cry when delivered, but she said that she heard a small whimper from the child. Appellant maintained, both to criminal investigators and at trial, that the child was alive until just before she had taken the child to the hospital. Military medical officers who had attended the autopsy testified, however, that a "float test" of the child's lungs performed during the autopsy indicated that the child had never taken an efficient breath of air. Other autopsy tests indicated that the child was alive when she passed through the birth canal and that the child had no congenital defects. The medical officers testified that the likely cause of death was primary apnea, a not-unusual condition in which the baby does not take its first breath unaided.

The military judge specifically cited *Gibson* as the basis for requiring an instruction on the legal definitions of the terms "human being" and "born alive" under these circumstances. Both parties expressly agreed that such an instruction was necessary, and both agreed that the military judge should use the standard set forth in *Gibson*.

Pursuant to the agreement of the parties, and without subsequent objection by either party, the military judge instructed the members as follows:

> Both the greater offense of involuntary manslaughter and the lesser offense of negligent homicide require proof beyond a reasonable doubt that the child was born alive in the legal sense, that is, the child had been wholly expelled from its mother's body and possessed or was capable of an existence by means of circulation independent of the mother's. Included in the term circulation is the child's breathing or capability of breathing from its own lungs. For the accused to be found guilty of either the greater offense of involuntary

manslaughter or the lesser offense of negligent homicide, you must be convinced beyond a reasonable doubt based upon the evidence that the accused's newborn infant was born alive. If you are not convinced beyond a reasonable doubt that the accused's newborn infant was wholly expelled from her mother's body and possessed or was capable of an existence beyond—excuse me, existence by means of circulation, independent of the accused's, you must find the accused not guilty of the greater offense of involuntary manslaughter and the lesser offense of negligent homicide.

### 3. Decision by the Court of Criminal Appeals

The Court of Criminal Appeals affirmed, but decided to supplant *Gibson's* "born alive" standard with a new test based upon "viability outside the womb." The Court stated:

[W]e believe that public policy demands that a newborn infant, wholly expelled from the mother, be afforded the maximum protection possible under the law. To ensure that protection, we adopt a "viability outside the womb" standard. That standard applies the born-alive rule used in *Gibson* to the extent that it requires the infant be fully expelled from the mother, and that the infant have the capability of existing independent from the mother's circulatory system. . . .

This standard also requires a determination of whether that capability exists. To make that determination, we adopt BLACK'S LAW DICTIONARY'S definition of "born alive," and conclude that an infant need not be breathing at the time it is fully expelled from its mother so long as it "shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord or definite movement of voluntary muscles. . . ." BLACK'S LAW DICTIONARY at 184. In making this determination, as recognized by the *Gibson* court, it is also appropriate to consider current medical technology.

52 MJ at 521 (emphasis omitted).

### C. Discussion

■ Because manslaughter under the UCMJ is derived from the common law, it is appropriate to construe Article 119—including the phrase "human being"—in the context of the common law. *See Robbins, supra* at 163, citing *Harrison,* 16 USCMA at 485, 37 CMR at 105; *cf. United States v. Spencer,* 839 F.2d 1341, 1343 (9th Cir.1988)(Congress intended the federal murder statute, 18 USC § 1111, to reflect the common law definition of murder, which required that the victim was born alive.). The decision of the court below, while noting a number of important "public policy" issues, does not demonstrate that, under the circumstances of the present case, those questions should be resolved in a judicial rather than a legislative forum. *See generally* H.R. 2436, 106th Cong., 1st Sess. (1999) ("An Act to amend title 18, United States Code, and the Uniform Code of Military Justice to protect unborn children from assault and murder, and for other purposes"); S. 1673, 106th Cong., 1st Sess. (1999) ("A Bill to amend titles 10 and 18, United States Code, to protect unborn victims of violence.").

Although *Gibson,* a 1954 Air Force Board of Review decision, does not serve as binding precedent either on our Court or on the Navy–Marine Corps Court of Criminal Appeals, its persuasive analysis accurately reflects the modern common law view that the term "human being" means a child that was "born alive," and that "born alive" means that the child was "wholly expelled from its mother's body and possessed or was capable of an existence by means of a circulation independent of her own." 17 CMR at 926.

*Gibson* has been the sole authoritative voice in military jurisprudence on this issue for nearly a half-century. The continued viability of the *Gibson* standard is reflected in the fact that it was the source used by the military judge and parties at trial, both in identifying the need for an instruction as to the terms "human being" and "born alive" and in forming that instruction. It was the single authority cited in direct support of our statement in *Robbins, supra* at 163, that "[a]t common law, a newborn child was required to be 'born alive' to be the subject of homicide." As this Court noted in a related context in *Harrison, supra* at 485, 37 CMR at 105: "In our opinion, the course of decision is

clearly marked by established military law and practice."

We note that appellant acknowledges in her brief that the state jurisdictions "that use the common law for determining when a fetus becomes a 'person' for purposes of criminal prosecution generally follow the rule set out in *People v. Hayner*, 300 N.Y. 171, 90 N.E.2d 23, 24 (1949)"—the case relied upon by the Board of Review in *Gibson* decision. Final Brief at 16.

In *Gibson*, the Board of Review stated that *Hayner* represented "a sound application of common law legal principles in the light of modern advancements in medical knowledge of human physiology." 17 CMR at 926. We agree, and note that *Gibson's* application of *Hayner* continues to offer flexibility to accommodate advancements in medicine and science that inevitably affect the reality of what it means to be "born alive."

■ Because *Gibson* is based upon sound legal principles, we reject the suggestion of the court below that the *Gibson* standard should be replaced by a new "viability outside the womb" standard. In the present case, the military judge recognized the possible issue presented by the evidence as to whether appellant's newborn daughter had been "born alive" in terms of the statute's application to an unlawful killing of a "human being." Both parties agreed with his assessment and with his instructions, and those instructions fully and accurately conveyed the definition of those terms found in *Gibson*.

In light of the foregoing considerations, we conclude that the military judge's instructions were not in error and that it was unnecessary for the Court of Criminal Appeals to modify the *Gibson* standard. In view of our decision to reject the approach of the court below, and to instead focus on the military judge's application of the *Gibson* standard to the present case, the following issues are moot: Issues II and III (challenging the basis of the lower court's definition of "born alive") and Issue VII (appellant's *ex post facto* and due process attacks on the decision of the court below).

## II. CULPABLE NEGLIGENCE AND LEGAL SUFFICIENCY (ISSUES IV, V, AND VI)

Issue IV raises the question of whether giving birth without medical attention, by itself, can be the basis for finding culpable negligence. Issue V asks whether a mother "in the throes of" such unattended childbirth is culpably negligent if she does not evaluate the child's condition and provide such medical attention as may be suggested by that evaluation. Issues IV and VI also contend that the evidence is legally insufficient to support a conviction for involuntary manslaughter.

### A. Legal Context

Under Article 119(b), a person is guilty of involuntary manslaughter when that person, "without an intent to kill or inflict great bodily harm, unlawfully kills a human being ... by culpable negligence; ...." The Manual for Courts–Martial provides the following explanation of culpable negligence:

> It is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission. Thus, the basis of a charge of involuntary manslaughter may be a negligent act or omission which, when viewed in the light of human experience, might foreseeably result in the death of another, even though death would not necessarily be a natural and probable consequence of the act or omission.

Para. 44c(2)(a)(i), Part IV, Manual for Courts–Martial, United States (1998 ed.).

■ Culpable negligence arises only from a legal duty to act. "When there is no legal duty to act there can be no neglect." Para. 44c(2)(a)(ii), *supra*. A parent has such a duty toward a child with respect to providing medical assistance. *United States v. Martinez*, 52 MJ 22, 25 (1999), citing *United States v. Valdez*, 40 MJ 491, 495 (CMA 1994). The parent is culpably negligent in failing to provide such assistance when "a reasonable person in such circumstances would have realized the substantial and unjustified danger created by his act." *Martinez, supra* at 26 (emphasis omitted), quoting *United States v. Baker*, 24 MJ 354, 356 (CMA 1987), and

citing *United States v. Henderson,* 23 MJ 77 (CMA 1986), and *United States v. Brown,* 22 MJ 448 (CMA 1986).

## B. *Factual Background*

Appellant kept her pregnancy a secret from the Navy and from her friends and family. When she realized she was in labor, she began to pack with a view towards leaving her ship and going to a civilian Italian hospital in an effort to maintain the secrecy of her pregnancy. Her labor pains became more intense, however, so she lay down on her rack. Because it was past 10:00 p.m. on a Saturday night, there were relatively few people on board.

Shortly thereafter, she began to deliver. While standing between two racks, with her pants and underwear lowered to her knees, the child emerged and landed in her pants. Appellant cut the umbilical cord with a pocket knife, lay the child on a rack, and covered the child with a blanket. She then used some sheets to clean up the blood and liquid from the deck. She placed the wet and bloody sheets, the clothes, and the child in a trash bag with holes punched in it, and she carried the bag off the ship.

There were three doctors assigned to appellant's ship. In addition, two medical corpsmen who were experienced in delivering babies were on board at the time of the delivery. During the labor and birth process, a number of people walked nearby, but appellant sought no assistance. Appellant acknowledged that she did not check on the child for over an hour after the birth, and did not realize that the child needed medical attention until 12 hours after birth. Appellant admitted at trial that she knew she should have sought medical attention when she realized that she was going to give birth and that she should have checked on her child to make sure it was all right.

As noted in part I.B.2., *supra,* an autopsy revealed that the child was alive while in the birth canal, did not have any congenital defects, and probably did not draw its first effective breath—leading to a conclusion that the child likely died of primary apnea, a condition easily corrected with simple stimulation.

## C. *Discussion*

Appellant does not challenge the principle that, as a general matter, a parent has a legal duty to provide medical assistance to his or her child and that a parent is culpably negligent when death might foreseeably result from failure to provide such medical assistance. Appellant contends, however, that she was not culpably negligent under the circumstances of this case—that is, that death was not a foreseeable consequence of an unattended childbirth in general or under the circumstances of a mother "in the throes of childbirth."

Notwithstanding the manner in which appellant has framed these issues, we note that the lower court did not conclude that giving birth without medical assistance constitutes culpable negligence as a matter of law. Likewise, the court did not conclude that failure to check the baby's health while "in the throes of childbirth" constituted culpable negligence. Instead, the court below properly treated the parental duty to provide a child with medical assistance as the bedrock principle, and it viewed culpable negligence in fulfilling that duty as a question of fact to be decided on the basis of all applicable evidence. *See* 52 MJ at 523–24.

Viewed in that context, the essential question that is before our Court is whether the evidence is legally sufficient to support the finding at trial that appellant's conduct was culpably negligent. The test is whether, considering the evidence in a light most favorable to the prosecution and drawing every reasonable inference from the record in favor of the prosecution, a reasonable factfinder could have found that appellant was culpably negligent beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. McGinty,* 38 MJ 131 (CMA 1993); *United States v. Turner,* 25 MJ 324 (CMA 1987).

The evidence of record is adequate to meet this standard. The Government introduced evidence to show that appellant first made the conscious decision to not invoke medical

assistance during her pregnancy or childbirth and then was not attentive to the health or medical condition of her child for over an hour after delivery. We need not decide whether either factor, standing alone, would be sufficient to demonstrate culpable negligence, because together they provide a basis upon which a reasonable factfinder could have found that her actions, "when viewed in the light of human experience, might foreseeably result in the death of" her child, "even though death would not necessarily be a natural and probable consequence of the act or omission." *See* para. 44c(2)(a)(i), *supra.*

Moreover, there is no evidence in the record that would cause a reasonable factfinder to reject this conclusion. This is not a case of an unexpected delivery in an area where medical attention was not available. The delivery was rapid and not drawn-out or incapacitating. Immediately after the delivery, appellant was able to clean up the evidence of the childbirth and to evacuate herself, her child, and the bloody clothes and rags from her ship so that her secret would not be discovered. There is no evidence of any complications with the birth or any flaws or defects with the child that could not easily have been remedied.

Under these circumstances, the evidence, when viewed most favorably toward the prosecution under *Jackson,* provides an adequate basis upon which the factfinders could reasonably find beyond a reasonable doubt that appellant owed a duty of care to her child and that she was culpably negligent in fulfilling that duty. *Compare State v. Osmus,* 73 Wyo. 183, 276 P.2d 469, 471 (Wyo.1954), *with State v. Shephard,* 255 Iowa 1218, 124 N.W.2d 712, 722 (1963), and *Vaughan v. Virginia,* 7 Va.App. 665, 376 S.E.2d 801, 804 (1989).

### III. LEGAL SUFFICIENCY OF THE EVIDENCE OF FALSE OFFICIAL STATEMENTS (ISSUE VIII)

In *United States v. Solis,* 46 MJ 31 (1997), we held that statements to investigators could be prosecuted under Article 107,

UCMJ, as false official statements, and rejected application of the so-called "exculpatory no" doctrine to Article 107. In *Solis,* we took note of paragraph 31c(6)(a) of Part IV of the Manual, *supra,* which states:

A statement made by an accused or suspect during an interrogation is not an official statement within the meaning of the article if that person did not have an independent duty or obligation to speak.

We observed that—

[b]ecause this guidance [in paragraph 31c(6)] is not based upon the statutory elements of the offense [under Article 107], it does not impose upon the prosecution an affirmative obligation to prove such an independent duty or obligation.

46 MJ at 35. In view of the fact that the accused in *Solis* did not rely on the Manual's provision at trial, we held that he could not assert it on appeal. We reserved judgement as to whether the applicable Manual provisions were "intended to establish a procedural right that can be invoked by an accused or whether they constitute internal guidelines intended only to regulate government conduct." *Id.* at 35–36.

We are presented with a similar situation in this case. Appellant's contention has originated only on appeal. At trial, she did not assert the Manual provision as a defense to her prosecution under Article 107, and there were no motions before or during trial touching on this issue. Instead, the defense at trial was strictly mistake-of-fact, aimed at negating the elements of falsity and intent to deceive. *See* para. 31b(2) and (4), *supra.*

Under these circumstance, appellant has not preserved the issue of whether paragraph 31c(6)(a) "can be invoked by an accused to defend against a charge under Article 107." *Solis,* 46 MJ at 35.

### IV. DECISION

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.