THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ELIZABETH EHLERT, Defendant-Appellant.

First District (1st Division)   No. 1—00—0273

Opinion filed November 18, 2002.

Rita A. Fry, Public Defender, of Chicago (Allan R. Sincox, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Peter Fischer, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

This case comes before us for a second time. In the first trial a jury found defendant, Elizabeth Ehlert, guilty of murdering her newborn child. We reversed the conviction because the prosecution presented irrelevant and highly prejudicial evidence that defendant had two abortions. *People v. Ehlert*, 274 Ill. App. 3d 1026 (1995). On remand defendant chose a bench trial. The trial court found defendant

guilty of murder. On this appeal, defendant argues that the prosecution failed to prove that the child was born alive, that defendant performed any act after the birth to cause the death, or that defendant had the mental state necessary for murder. Because we find the evidence insufficient to prove live birth, we reverse the conviction.

On August 21, 1990, defendant gave birth in her bedroom, in the home she shared with her two sons, her father, and her fiancé, Steven King. Two days later employees of the Salt Creek Park District discovered the baby's corpse in a nearby lake. A creek that ran behind defendant's house fed into the lake.

Police contacted King on September 6, 1990. King told the police he thought he heard a baby cry in defendant's bedroom for one or two seconds on August 21, 1990, while defendant was giving birth. Police talked with defendant on numerous occasions over the next few weeks. Defendant made contradictory statements concerning the birth. A grand jury indicted defendant for the murder of her baby.

On retrial, as at the original trial, the prosecution presented several witnesses who testified that between April and mid-August 1990, defendant repeatedly told them she was not pregnant. She told the witnesses, including King, that she had a cancerous tumor and she had seen several doctors about it. On August 17, 1990, defendant told King that a doctor discovered she was pregnant, but the fetus was dead, and the doctor gave her a shot to induce an abortion.

King testified that he first met defendant in January 1990, and he moved in with her shortly thereafter. Around 3 a.m. on August 21, 1990, defendant woke King up and told him she was in labor. She screamed in pain. King began pacing the hallway. About 30 minutes later, while defendant was still screaming, King said he would call for an ambulance. Defendant told him not to call because the labor was almost over. A few minutes later defendant asked King to get a plastic bag. King testified that he heard a baby cry for two seconds as he went to get the plastic bag. He admitted on cross-examination that he told police only that he thought he heard a baby cry.

King testified that he went to the bedroom door to give defendant the bag. Defendant then crossed the hallway to the bathroom, carrying nothing. After five minutes defendant returned to the bedroom. She came out carrying the plastic bag by the top. King swore that he heard nothing from the bedroom during the five minutes the newborn was alone in there. He saw no signs of motion in the bag when defendant took the bag from the house. When defendant returned, she said she put the bag in the creek to let the fetus go back to nature.

Police officers who questioned defendant on September 6, 1990, testified that she told them she had miscarried a fetus 15 weeks old

and flushed it down her toilet. Police told her they had talked to King. She said she threw the miscarriage in the garbage, then she said King threw it in the garbage. When they said King told them a different story, she said she did not remember what happened, but King's account was probably true because "he doesn't lie." She admitted that she lied to King, and she had not seen any doctors throughout her pregnancy.

Defendant told police her waters broke two days before the birth, when she fell while trying to retrieve her son's toy from a tree in her yard. She put the fetus in a garbage bag and left the bag by a tree near the bank of the creek out back. When they asked if she threw the bag into the creek, she said, "No, unless you want me to say I did it, then I did it." She asked to have the baby buried next to defendant's mother. In another interview defendant told police that her ex-husband, not King, fathered the baby late in 1989. She admitted that she had sexual relations with her ex-husband frequently in November 1989.

A few days later defendant called the police and said she could not live with herself, and she wanted to tell them the truth. She asked them to assure her King would take care of her children if she went to jail. Later she told them that when she went to the bathroom after delivering the dead fetus, King went to the bedroom, picked up the bloody towels and the baby and threw them out.

Dr. Mitra Kalelkar, assistant chief medical examiner for Cook County, admitted that when she completed the autopsy she could not determine to a reasonable degree of medical certainty that the baby had been born alive. She found no unusual cause of death, so her "suspicion was that the baby drowned." The prosecutor asked Dr. Kalelkar directly whether, at the completion of the autopsy, she "form[ed] an opinion within a reasonable degree of medical certainty as to whether or not the baby was born alive?" Dr. Kalelkar answered:

> "[A]t that time I had a suspicion that this baby was born alive and that the cause of death would be drowning; and pursuant to that suspicion, which I related to the police officers, I instructed them to investigate further."

She later reiterated that after the autopsy she told police she "could not tell for sure whether it had been born alive."

After police advised her of their investigation, she concluded in December 1990 that the baby had been born alive and it had drowned. She relied on evidence that defendant had lied to several persons about her pregnancy and her visits with doctors, and, most particularly, she relied on King's statement to police that he thought he heard a baby cry.

Dr. Kalelkar testified that she saw no evidence in the decomposing corpse of any natural disease process. She found air in the lungs, hemorrhage on the skull, and some blood on the umbilical cord. She admitted that the air she found in the lungs could have resulted from decomposition rather than breathing. She also admitted that "[t]here is no specific way of telling whether that rip [of the umbilical cord] was antemortem or postmortem." Blood may remain in the umbilical cord after the baby dies. While the hemorrhaging suggested that the baby was alive when the head went through the vaginal canal, it did not show that the baby survived the birthing process.

On cross-examination Dr. Kalelkar admitted that a baby could die due to partial placental abruption. The baby could go into shock if it lost 60 milliliters of blood in the birthing process.

Defendant presented two pathologists. Both agreed with Dr. Kalelkar that the autopsy findings could not support a finding to a reasonable degree of medical certainty that the baby was born alive. Dr. John Pless testified that the hemorrhage on the skull could occur even if the fetus had already died. If placental abruption killed the fetus shortly before delivery, one would expect findings like those present here. A fall from a tree could cause the placenta to detach from the uterine wall, and the detachment could cause fetal death. The force of the fall need not be great if the trauma occurred at a place that maximized impact on the placenta. The baby could also have died from blood loss in the birthing process or obstruction of the airway. Water and bacteria probably would have eliminated any mucus plugs that might have caused asphyxiation.

But Dr. Pless also agreed with Dr. Kalelkar that no marks on the body showed disease or physical injury. Decomposition probably would have eliminated any evidence the baby died from infection. He also agreed that a newborn faces a greater risk of death from asphyxiation or blood loss in an unattended home birth than in a hospital delivery.

Dr. Robert Kirschner found sufficient evidence to conclude that the baby was alive when labor began, but he found the evidence insufficient to show that the baby survived labor. Even if the baby was alive at birth, it may have died from failure to clear its airways, blood loss or infection. He said that if a child had marked respiratory distress at the time of birth, it might give a feeble cry, then die. He agreed with the prosecutor that a cry would show live birth.

The court expressly found credible King's testimony that he heard a baby cry, and that testimony together with the medical testimony led the court to conclude that the baby was born alive. The court did not comment on the medical testimony that the baby may have died after a live birth from various noncriminal causes, and the court drew

no conclusions about what acts caused the death. But the court found that defendant committed murder and sentenced her to 30 years in prison.

■ On appeal defendant argues that the evidence does not support a finding beyond a reasonable doubt that her baby was born alive. We review the evidence in the light most favorable to the prosecution to determine whether any reasonable trier of fact could have found live birth beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985).

■ Our supreme court in *People v. Greer*, 79 Ill. 2d 103, 111 (1980), clarified that Illinois has adopted common law standards for determining whether a baby was born alive. If the baby expires during birth, it cannot be the victim of homicide. *Greer*, 79 Ill. 2d at 111. The prosecution must prove that the mother completely delivered the baby alive and the baby established a separate and independent life. *People v. Bolar*, 109 Ill. App. 3d 384, 390 (1982); see 410 ILCS 535/1(5) (West 2000).

Here, the prosecution's medical expert agreed with defense experts that the physical findings alone did not prove live birth to a reasonable degree of medical certainty. Many difficulties may arise in the birthing process that could kill the baby prior to complete separation from the mother, and an unattended home birth aggravates the possibility of such death. In reaching her conclusion that the baby was born alive, Dr. Kalelkar relied on King's statement to police that he thought he heard a cry. Although Dr. Kalelkar also recited evidence that defendant did not want the child and lied to neighbors about the pregnancy, she did not explain why an unwanted child would have a better chance of surviving the birth process or how that evidence in any way showed live birth.

But King testified that he heard the cry for about two seconds, shortly after defendant told him the labor was almost over. He did not see the baby when he heard the cry. He heard no sound and saw no movement from the bedroom during the five minutes after birth when defendant left the baby alone in the room, while she went to the bathroom to clean herself. Moreover, King admitted that he was less than certain when he first spoke to police, as he told them only that he thought he heard a cry.

In several cases courts applying the common law have found a single cry insufficient to prove live birth beyond a reasonable doubt, because the baby may breathe during the birth process, before completed delivery. *Shedd v. State*, 178 Ga. 653, 173 S.E. 847 (1934); *Morgan v. State*, 148 Tenn. 417, 256 S.W. 433 (1923). In *Shedd* the pathologist testified that in his opinion the child breathed. But the

reviewing court found no evidence breathing took place after separation from the mother, so the court reversed the murder conviction.

The facts of *Lane v. Commonwealth*, 219 Va. 509, 248 S.E.2d 781 (1978), are distinctly similar to the facts at issue before us. In *Lane* the doctors found air in a newborn's lungs and no signs of a cause of death, so they concluded that the baby had drawn breath and that it had been born alive. When police found the baby's corpse in a garbage bag, the defendant, returning from her honeymoon, initially denied knowing anything about the baby. Confronted with evidence tying her to the baby, she admitted that she gave birth but said the baby showed no signs of life. The court, in reversing the manslaughter conviction, observed that no evidence showed the baby achieved a life separate from that of the mother. *Lane*, 219 Va. at 515, 248 S.E.2d at 784.

Courts applying the common law have reached differing conclusions about the use of confessions and abuse of the corpse as evidence of live birth. In *People v. Hayner*, 300 N.Y. 171, 90 N.E.2d 23 (1949), the defendant admitted that he impregnated his daughter and he strangled the baby with the umbilical cord within minutes of the birth. But the prosecution's witnesses, the baby's mother and grandmother, swore they never saw the baby or heard it cry. The prosecution's medical expert found no signs of trauma or disease sufficient to explain the death, and he concluded from the expanded lungs that the baby had been born alive. On appeal from the murder conviction, the court held that the medical testimony amounted to conjecture, because other conditions could cause the lungs to expand. *Hayner*, 300 N.Y. at 176, 90 N.E.2d at 25. Despite the confession, the court reversed the conviction because the prosecution failed to prove live birth.

The court in *Morgan* also reversed a conviction for murdering a baby found with a crushed skull because the evidence did not prove live birth. And the cut throat of the newborn in *Berryman v. State*, 51 Tex. Crim. 192, 101 S.W. 225 (1907), did not suffice to prove live birth.

But in *State v. Collington*, 259 S.C. 446, 192 S.E.2d 856 (1972), the court affirmed a murder conviction, holding that paper stuffed into the newborn victim's mouth helped prove live birth, because no one would stuff paper into the mouth of a baby that was already dead. A rag stuffed into the mouth of the newborn victim in *Heubner v. State*, 131 Wis. 162, 111 N.W. 63 (1907), also helped prove live birth.

Here the corpse bore no marks of violence or other indications of human agency causing death. Even under the standard of *Collington* and *Heubner*, the prosecution had insufficient evidence that the baby breathed after separation from defendant. The evidence of live birth is far weaker than the evidence found insufficient in *Hayner* and *Berry-*

*man.* One court has rejected all of these cases, finding that live birth may occur without complete separation from the mother, but that case expressly rejected the common law standards for determining live birth. *People v. Chavez*, 77 Cal. App. 2d 621, 624-26, 176 P.2d 92, 94-95 (1947).

The prosecution argues that Dr. Kirschner conceded that if the baby cried, then it was born alive. But Dr. Kirschner did not testify that a cry proved the baby survived the entire birthing process. He did not deny that babies may cry prior to complete separation from the mother. Dr. Kirschner apparently would consider a baby to be born alive if it breathed and cried while partially separate from the mother. But the common law requires proof of life after complete separation from the mother. Dr. Kirschner's testimony shows only that he applied a definition of live birth different from the common law definition of live birth.

The prosecution relies on defendant's incriminating statements as proof of live birth. Defendant told police that King threw out the bag holding the baby, and she suggested that if he said he heard a cry, he must have heard it while throwing it out, when she could not hear it. She also asked to have the baby buried next to defendant's mother.

We do not see how the burial request supports an inference of live birth. A woman may acknowledge her stillborn baby as a part of her family and wish to have it buried with her family. Defendant suggested the time at which King might have heard a cry in response to police officers telling her that King said he heard a cry. Neither then nor at any other time did defendant state or even suggest that she ever heard a cry or saw the baby move.

That absence from defendant's statements sharply distinguishes this case from *People v. Ryan*, 9 Ill. 2d 467 (1956). In *Ryan* a nurse gave birth at home, wrapped the baby in a towel and left it in an overnight case for two days before burying it. The pathologist testified that in his opinion the child had breathed. A jury found the defendant guilty of involuntary manslaughter. Our supreme court affirmed, relying in part on the defendant's statement that she heard the baby cry and saw it move before she wrapped it in the towel. *Ryan*, 9 Ill. 2d at 473-74.

■ The record in this case includes no observation from any witness and no statement from defendant that the baby ever moved or cried after completion of the birth process. All of the pathologists agreed that the physical evidence was consistent with death during birth, just as it was consistent with live birth. The prosecution's pathologist found that the baby had been born alive because a witness thought he heard it cry for one or two seconds. But the single, short

cry the witness thought he heard, if it occurred, may have occurred before complete separation from the mother, and therefore it is not sufficient to prove live birth. Because the evidence cannot support a finding beyond a reasonable doubt of live birth, we must reverse the conviction.

Reversed.

GORDON, P.J., and COHEN, J., concur.